[No. H006806. Sixth Dist. June 5, 1991.]

CAMSI IV, Plaintiff and Appellant, v.
HUNTER TECHNOLOGY CORPORATION, Defendant and Respondent.

## COUNSEL

Berliner, Cohen & Biagini, Ralph J. Swanson, Russell J. Hanlon and Stacy L. Saetta for Plaintiff and Appellant.

Nossaman, Guthner, Knox & Elliott, Kurt W. Melchior and Alan D. Miller for Defendant and Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—Hunter Technology Corporation (Hunter) manufactured printed circuit boards on a parcel of real property in Santa Clara County for a period of years ending in 1983. Title to the parcel passed to CAMSI IV, a California general partnership, in May 1985. In December 1988 CAMSI IV sued Hunter, and several other defendants, alleging in pertinent part that in its manufacturing operation Hunter had discharged harmful substances referred to by CAMSI IV as "volatile organic chemicals" (VOCs), including trichloroethene (TCE), into the parcel's soil and groundwater, that a government agency had ordered the VOCs be cleaned up, and that as a result of the agency's order CAMSI IV was secondarily liable for the cost of the cleanup and had lost a potential sale of part of the parcel. Hunter's general demurrers to CAMSI IV's second amended complaint were sustained without leave to amend. CAMSI IV appeals from the ensuing judgment for Hunter.

We shall conclude that on the face of the second amended complaint CAMSI IV's claims against Hunter were barred by the applicable statute of limitations, and that neither CAMSI IV nor the record suggests any way in which the complaint could be amended to avoid the bar. Accordingly we shall affirm the judgment.

The appeal presents a pure question of law: Whether on consideration of all well-pleaded facts in CAMSI IV's second amended complaint " 'it appears that the plaintiff is entitled to any relief at the hands of the court against the defendants . . . .' " (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032], fn. omitted; *Frantz* v. *Blackwell* (1987) 189 Cal.App.3d 91, 94 [234 Cal.Rptr. 178].) Because CAMSI IV was denied leave to amend we construe its allegations liberally "with a view to substantial justice between the parties." (Code Civ. Proc., § 452; cf. *Gruenberg* v. *Aetna Ins. Co., supra*, 9 Cal.3d at p. 572, fn. 4.)

Reviewed in this light, the second amended complaint states or sufficiently implies the following facts pertinent to our analysis:

Monsanto Company owned the parcel, and conducted its own manufacturing operations there, from 1950 to 1983, and during that time disposed of liquid and solid wastes, including a "non-toxic substance" known as "HMBA," on the parcel. From 1968 to 1983 Monsanto leased a building near the southeastern corner of the parcel to Hunter. In manufacturing printed circuit boards Hunter used TCE and other enumerated VOCs "and operated a subsurface sump where rinse wastewaters were temporarily stored. Releases of TCE [and other VOCs] have been found in the soil and groundwater in the area of HUNTER's former facility."

In or about 1983 Monsanto sold the parcel to third parties, and in October 1984 these or successor owners agreed to sell the parcel to an entity called Kimball Small Properties (KSP).

Before close of escrow for the purchase, "and as part of [KSP's] 'due diligence' investigation," a KSP representative discussed "the nature of contamination of the Subject Property" with an apparently knowledgeable representative of Monsanto. The Monsanto representative represented "that HMBAs were the only type of toxic [*sic*] material on the Subject Property which required cleanup. This representative of MONSANTO did not inform [KSP] that the presence of other toxic substances had been reported by MONSANTO's consultants, Emcon . . . , in its tests of soil and groundwater near the northern corner of the Subject Property."

The sale to KSP was completed in December 1984. CAMSI IV was formed on May 1, 1985; KSP (which was the general partner of a limited partnership which, in turn, was one of the two partners of CAMSI IV) transferred the parcel to CAMSI IV on that date.

In July 1985 the San Francisco Bay Regional Water Quality Control Board "issued a waste discharge requirement order naming MONSANTO and KSP as

dischargers . . . . The July 1985 Order set forth guidelines for cleanup of the HMBA and mandated investigation of the groundwater and soil of the Subject Property, partly because TCE . . . and other VOCs had been found thereon and thereunder."

"The July 1985 Order did not state that the TCE and other VOC contamination had reached levels sufficiently high to pose a health risk and did not identify an entity responsible for the presence of those substances. The July 1985 Order was not adopted to impose liability upon CAMSI IV or any other entity for cleanup of the TCE and VOC contamination, and no such liability was imposed. CAMSI IV was thus not harmed by the July 1985 Order."

In November 1985 CAMSI IV sold "an uncontaminated portion of the Subject Property which had been removed from the scope of the July 1985 Order."

In February 1986 CAMSI IV sold "another uncontaminated portion of the Subject Property which had likewise been removed from the scope of the July 1985 Order."

In early June 1987 the regional board "issued a letter to MONSANTO and HUNTER stating the Control Board's [regional board's] intent to issue a tentative order for the cleanup of TCE contamination on the Subject Property. . . . This tentative order was apparently based upon the results of groundwater and soil testing near HUNTER's former location—a new and different area of the Subject Property from that where the July 1985 Order had earlier reported TCE concentrations. These tests revealed *for the first time* that TCE and other VOCs existed on the Subject Property at levels sufficiently high to warrant action by the [regional board] and that the likely source of that contamination was HUNTER and/or MONSANTO. This information and the resulting proposed tentative order constituted the first time CAMSI IV had suffered appreciable harm caused by identifiable culpable parties."

"Shortly thereafter, in early June 1987, a potential purchaser of the Subject Property from CAMSI IV withdrew its offer due to the recent discovery of toxic contamination thereon."

In September 1987 the regional board "issued a tentative order naming MONSANTO, HUNTER and KSP as responsible parties for the cleanup and abatement of TCE and other VOC contamination on the Subject Property."

"On March 16, 1988, the Control Board [regional board] adopted a cleanup order, in substantially the same form as the tentative order, for the

remediation of TCE contamination and other contamination on the Subject Property, naming MONSANTO and HUNTER as primarily responsible parties and CAMSI IV as secondarily responsible . . . . The 1988 Order identifies HUNTER as a discharger because releases of the types of chemicals used in its processes have been found in the soil and groundwater of the Subject Property beneath HUNTER's former facility. MONSANTO is a named discharger because it owned and occupied the Subject Property during the period in which chemicals were released either by MONSANTO or HUNTER. CAMSI IV is a named discharger solely because it is the current owner of the Subject Property."

To these basic allegations CAMSI IV added a number of separate counts designed to support theories of relief against various defendants. The third, fourth, and fifth counts were directed against Hunter.

The third count (for "negligence") alleged in pertinent part that Hunter had "a duty to conduct its operation safely and in accordance with all government regulations, including those regulations governing the disposal of toxic materials, which duty extends to CAMSI IV as the subsequent owner" of the parcel and that "[w]ithin the last three years, CAMSI IV learned that HUNTER breached its duty to CAMSI IV by negligently disposing of TCE and other VOCs in a manner which allowed those substances to enter the soil and groundwater of the Subject Property. Also within the last three years, CAMSI IV suffered appreciable harm from HUNTER's negligence."

The fourth count (for "negligence per se") alleged in pertinent part that "California Water Code sections 13050, 13261 and 13264 make it unlawful for any person to dispose of hazardous materials in a manner that poses a public health risk through contamination of groundwater. . . . [¶] Within the last three years, CAMSI IV learned that HUNTER, through its disposal of TCE and other VOCs in a manner which has contaminated the groundwater of the Subject Property, violated California Water Code sections 13050, 13261, and 13264, thereby acting in a manner that is negligent per se. [¶] As a subsequent owner of the Subject Property after HUNTER's tenancy, CAMSI IV was among the persons intended to be protected by the Water Code sections herein cited."

The fifth count (for "strict liability") alleged in pertinent part that "[b]y using TCE and other VOCs in its processing of printed circuit boards, HUNTER was engaged in an ultrahazardous activity for which it is strictly liable for all harm caused by its use and disposal of said chemicals. [¶] Within the last three years, CAMSI IV learned that HUNTER had caused appreciable harm to CAMSI IV through HUNTER's ultrahazardous activity.

The harm that CAMSI IV has suffered and continues to suffer as a direct and proximate result of HUNTER's ultrahazardous activity is the type of harm which made its activity abnormally dangerous."

Hunter demurred to CAMSI IV's second amended complaint on the grounds that it did not state facts sufficient to support a legally cognizable theory of recovery against Hunter and that each of CAMSI IV's claims against it was in any event barred by the statute of limitations.

The trial court sustained Hunter's demurrers, without leave to amend, on the stated grounds that CAMSI IV had not sufficiently pleaded a theory of negligence or of strict liability for ultrahazardous activity. The court did not mention CAMSI IV's negligence per se theory or the statute of limitations.

In this court the parties have addressed detailed arguments to the merits of CAMSI IV's three theories as pled. In its respondent's brief Hunter asserted that the demurrers were properly sustained on the merits and also—although the trial court did not mention it—on the ground that each of the three theories was time-barred. Because we conclude CAMSI IV's claims, as pled, were barred by the statute of limitations we shall not reach the sufficiency of its theories of recovery. (Cf. *Spellis* v. *Lawn* (1988) 200 Cal.App.3d 1075, 1079 [246 Cal.Rptr. 385].)

■ Hunter had asserted the statute of limitations as an alternative basis for each of its demurrers; therefore, even though the trial court did not mention limitations in its order, the judgment should be affirmed if in fact all of CAMSI IV's claims against Hunter were time-barred. (*Spellis* v. *Lawn*, *supra*, 200 Cal.App.3d at p. 1079; cf. *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 324 [182 Cal.Rptr. 506, 644 P.2d 192]; *E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 504 [146 Cal.Rptr. 614, 579 P.2d 505]; *Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 424-425 [282 P.2d 890]; *Weinstock* v. *Eissler* (1964) 224 Cal.App.2d 212, 223-224 [36 Cal.Rptr. 537].)

■ The parties agree that all of CAMSI IV's theories of recovery were subject to the three-year limitation period for claims for injury to real property. (Code Civ. Proc., § 338, subd. (b).) The question, to be answered by reference to the allegations of the second amended complaint, is when the three-year period began. CAMSI IV takes the position the period did not begin until June 1987, when (in its view) it first suffered appreciable harm and first had reason to suspect that VOC contamination near Hunter's former facility "was caused by wrongdoing." Hunter asserts that the period began no later than July 1985, more than three years before CAMSI IV filed its action in December 1988.

■ The orthodox rule in tort actions is that the applicable limitation period will run from accrual of the action "upon the occurrence of the last element essential to the cause of action." (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187 [98 Cal.Rptr. 837, 491 P.2d 421].) In the case of injury to real property, the orthodox rule would dictate that "if the defendant's act causes *immediate* and *permanent* injury" to the property the statute would run from the date of the act. (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 424, p. 457.) If the defendant has caused injury by a series of acts, the orthodox rule suggests an action could be brought within the limitation period running from the last act. (Cf. *id.* § 425, pp. 458-459.)

The complaint alleges that Hunter manufactured printed circuit boards on the property "until 1983," and at least implicitly that Hunter's allegedly improper discharge of TCE and other VOCs continued until that time. Under the orthodox rule, the three-year limitation period would have commenced no later than 1983 and expired in 1986, two years before CAMSI IV filed its action.

CAMSI IV seeks to avoid the orthodox rule in two ways, asserting (1) that it experienced no *harm*, and thus its cause of action had not accrued, until after June 1987, and (2) that it may invoke the so-called "discovery rule" to delay commencement of the limitation period until it was aware, or could reasonably have been charged with awareness, both of its harm and of the negligent cause of its harm.

### 1. *Harm*

■ Actual and appreciable harm is a necessary element of a tort cause of action. (Cf. *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200-201 [98 Cal.Rptr. 849, 491 P.2d 433].) CAMSI IV asserts that it did not suffer appreciable harm as a result of Hunter's activities until, in June 1987, the regional board announced its intention to issue a tentative order requiring Hunter and Monsanto to clean up VOCs. The extension of this argument is that any knowledge of the VOCs CAMSI IV might have gained before June 1987 would have been irrelevant to the statute of limitations inasmuch as the cause of action had not yet accrued.

CAMSI IV's assertion fails for two reasons.

■ First, it is apparent as an abstract proposition, and has been assumed in a number of cases, that for limitations purposes the harm implicit in a tortious injury to property is harm to the property itself, and thus to *any* owner of the property once the property has been injured and not necessarily

to a particular owner. Thus once the sewer line has been improperly located on the property (*Field-Escandon* v. *DeMann* (1988) 204 Cal.App.3d 228, 233 [251 Cal.Rptr. 49]), or the lot preparation and foundation construction have been improperly done (*Bradler* v. *Craig* (1969) 274 Cal.App.2d 466, 472 [79 Cal.Rptr. 401]), or the encroaching buildings are constructed (*Troeger* v. *Fink* (1958) 166 Cal.App.2d 22, 26 [332 P.2d 779]), the tort is complete and the statute of limitations (unless forestalled by the "discovery rule" or some other special doctrine) begins to run: An owner must bring its claim to court within the statutory period or the claim will be barred *for that and all subsequent owners*. Normally a subsequent owner will not be personally harmed by the tort until he or she becomes the owner, but no case has held that each new owner thus becomes entitled to a new statute of limitations against the tortfeasor. Such a rule would wholly disregard the repose function of statutes of limitations. (But cf. *Pinole Point Properties* v. *Bethlehem Steel Corp.* (N.D.Cal. 1984) 596 F.Supp. 283, 293 [implying but not holding that new owner might have new limitation period running from date of purchase].)

Second, CAMSI IV's argument appears to equate harm with the regional board's announcement, in June 1987, of its intent to order cleanup of the offensive substances. But from the face of the second amended complaint it is apparent that any harm the alleged tortfeasor, Hunter, had done to the property had been completed by no later than 1983, and that so far as the complaint reflects the physical aspects of that harm were not progressive: The contamination of the soil and groundwater, once and to the extent caused by Hunter, apparently remained constant. To the extent harm to CAMSI IV, as distinct from harm to the land, might be relevant, that harm occurred as soon as CAMSI IV purchased the contaminated property at a price inferably greater than it would have paid given full disclosure and comprehension of the contamination. To avoid this conclusion CAMSI IV would be required to assert that the underlying harm to the land was wholly irrelevant to CAMSI IV's interests so long as the harm remained undiscovered, and thus that CAMSI IV was harmed not by Hunter's alleged contamination but rather by the regional board's announcement that the parcel was contaminated. CAMSI IV (in a portion of its briefs we need not otherwise reach) has flatly denied that this is its theory: Responding to Hunter's argument against its ultrahazardous activity theory, CAMSI IV said that "HUNTER contends that 'the harm that CAMSI IV alleges is [ ]not the contaminated condition of the property but the impact of the governmental response to that condition on the property's marketability' and that such harm 'is not the kind of harm the strict liability doctrine is intended to ameliorate.' . . . [¶] . . . HUNTER'S position is specious at best. What makes the disposal of toxic, hazardous waste ultrahazardous is the threatened harm to the soil and groundwater, such as ground water contamination via

leachate, surface water contamination via runoff or overflow, and poison via the food chain. [Citation.] This is exactly the kind of harm CAMSI IV sustained from HUNTER's disposal of toxic, hazardous wastes." If so, then CAMSI IV sustained that harm as soon as it took title to the parcel.

CAMSI IV's harm argument appears to confuse *harm* with *discovery* of harm. (Compare *Oakes* v. *McCarthy Co.* (1968) 267 Cal.App.2d 231, 254-256 [73 Cal.Rptr. 127] [a discovery case analyzed in harm terms] with *Evans* v. *Eckelman* (1990) 216 Cal.App.3d 1609, 1613-1615 [265 Cal.Rptr. 605] [recognizing *Oakes* as a discovery case].) Both are relevant to commencement of the limitation period, but they must be analyzed separately.

2. *Discovery Rule*

The "discovery rule" assumes that all conditions of accrual of the action—including harm—exist, but nevertheless postpones commencement of the limitation period until "the plaintiff discovers or should have discovered all facts essential to his cause of action [citations]," which is to say "when 'plaintiff either (1) actually discovered his injury and *its negligent cause* or (2) could have discovered injury *and cause* through the exercise of reasonable diligence [italics added].' [Citations.]" (*Leaf* v. *City of San Mateo* (1980) 104 Cal.App.3d 398, 407 [163 Cal.Rptr. 711]; cf. *Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109 [245 Cal.Rptr. 658, 751 P.2d 923]; *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 99 [132 Cal. Rptr 657, 553 P.2d 1129]; *Allen* v. *Sundean* (1982) 137 Cal.App.3d 216, 222 [186 Cal.Rptr. 863].) The rule is "based on the notion that statutes of limitations are intended to run against those who fail to exercise reasonable care in the protection and enforcement of their rights; therefore, those statutes should not be interpreted so as to bar a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence. [Citations.]" (*Saliter* v. *Pierce Brothers Mortuaries* (1978) 81 Cal.App.3d 292, 297 [146 Cal.Rptr. 271].) The rule has been applied in tort actions of various kinds, including cases which involve nonobvious (or latent) injuries to real property. (E.g., *Allen* v. *Sundean*, *supra*, 137 Cal.App.3d at p. 222; *Leaf* v. *City of San Mateo*, *supra*, 104 Cal.App.3d at pp. 407-409.)

A plaintiff whose complaint shows on its face that his or her claim would be barred by the applicable orthodox statute of limitations, and who intends to rely on the discovery rule to toll the orthodox limitation period, "must specifically plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence. [Citations.] Mere conclusory assertions that delay in discovery

was reasonable are insufficient and will not enable the complaint to withstand general demurrer. [Citation.]" (*Saliter* v. *Pierce Brothers Mortuaries, supra,* 81 Cal.App.3d at p. 297; cf. *Barrington* v. *A. H. Robins Co.* (1985) 39 Cal.3d 146, 154 [216 Cal.Rptr. 405, 702 P.2d 563]; *Anderson* v. *Brouwer* (1979) 99 Cal.App.3d 176, 182 [160 Cal.Rptr. 65]; *Bradler* v. *Craig, supra,* 274 Cal.App.2d at pp. 471-472.) Arguments that discovery-rule issues are necessarily factual and cannot be resolved on demurrer have been rejected. (Cf. *Saliter* v. *Pierce Brothers Mortuaries, supra,* 81 Cal.App.3d at pp. 299-301; cf. also *Anderson* v. *Brouwer, supra,* 99 Cal.App.3d at pp. 181-182.)

█ It might be inferred from CAMSI IV's second amended complaint that either Monsanto (which owned the parcel at the time the contamination occurred) or KSP (which allegedly conducted a " 'due diligence' investigation," presumably in light of the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 [CERCLA], 42 U.S.C. §§ 9601, 9601(35), 9607(b)(3); cf. comment, *CERCLA's Innocent Landowner Defense: The Rising Standard of Environmental Due Diligence for Real Estate Transactions* (1990) 38 Buffalo L.Rev. 827, 829) knew or should have known that Hunter had discharged VOCs. If so, their knowledge would have been imputed to CAMSI IV. (*Bradler* v. *Craig, supra,* 274 Cal.App.2d at p. 472.) But we need not search for such inferences, because CAMSI IV's pleading wholly fails to show that CAMSI IV would have been unable, despite reasonable diligence, to have discovered both the VOC contamination, and that Hunter was responsible for it, no later than July 1985.

CAMSI IV alleges that the July 1985 regional board order "mandated investigation of the groundwater and soil of the Subject Property, partly because TCE . . . and other VOCs had been found thereon and thereunder." CAMSI IV goes on to allege that in November 1985 (and again in Feb. 1986) CAMSI IV sold "uncontaminated" portions of the property which had been "removed from the scope of the July 1985 Order." Far from specifically pleading facts to show it could not, despite reasonable diligence, have discovered the harm and its negligent cause before June 1987, CAMSI IV has all but admitted the July 1985 order put it on contemporaneous notice that there was a serious problem affecting salability (and thus, necessarily, market value): Inferably it took affirmative steps to work around contamination problems when it sold the "uncontaminated" portions later that year and early the next. That the area Hunter allegedly contaminated was "a new and different area of the Subject Property from that where the July 1985 Order had earlier reported TCE concentrations" would have been irrelevant: Given notice of the presence of TCE or other VOCs anywhere on the property, the owner could properly be expected, in the exercise of reasonable diligence, to conduct an adequate investigation of all parts of its property

and particularly of former manufacturing sites. Certainly nothing in the pleading suggests CAMSI IV would have been unable, with reasonable diligence, to have discovered the pertinent facts.

We conclude as a matter of law, from the allegations of the second amended complaint, that as of July 1985 CAMSI IV possessed information sufficient at least to place it on notice of serious contamination problems on the parcel it owned, and from which by exercise of reasonable diligence it could have learned the full extent of the problems and the nature of their source. CAMSI IV's allegations that the July 1985 order did not warn of a health risk or identify the contaminator, and its conclusionary allegations that "within the last three years" it had learned of Hunter's asserted breaches of duty, are of no consequence to our conclusion: The burden was on CAMSI IV to plead *facts* to show *inability* to have made earlier discovery. (*Saliter* v. *Pierce Brothers Mortuaries, supra,* 81 Cal.App.3d at p. 297; cf. *Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at pp. 1110-1111 [summary judgment].) CAMSI IV did not bear its pleading burden.

Thus CAMSI IV's second amended complaint reflects on its face that the three-year limitations period commenced no later than July 1985 and that CAMSI IV's claims against Hunter were barred before it filed its complaint in December 1988.

### 3. *Amendment*

In the last sentence of its opposition in the trial court to Hunter's demurrers CAMSI IV stated that "[i]f the Court is inclined to sustain the Demurrer in any particular, CAMSI IV respectfully requests that leave be granted to amend the Second Amended Complaint to meet the Court's concerns." CAMSI IV did not indicate how it would propose to amend its complaint, and did not mention an amendment at the hearing on the demurrers. With respect to the merits of its theories of recovery CAMSI IV has argued in this court that, if inclined to agree with Hunter, we should grant CAMSI IV an opportunity to amend its pleading. CAMSI IV did not brief a similar argument with respect to the statute of limitations. At oral argument we raised the question of amendment on our own motion.

■ Whether a plaintiff who has failed to state a cause of action should be given leave to amend his or her complaint is entrusted to the discretion of the trial court. (Code Civ. Proc., § 472a, subd. (c).) When leave has not been granted, the question on appeal (whether or not the plaintiff asked to amend the complaint) will be whether the trial court abused its discretion. (Code Civ. Proc., § 472c.) "[W]e decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has

abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; cf. *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737]; *Sullivan* v. *State Bd. of Control* (1985) 176 Cal.App.3d 1059, 1066 [225 Cal.Rptr. 454].) It has been suggested that " '[p]laintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading. [Citation.]' " (*Goodman* v. *Kennedy, supra,* 18 Cal.3d at p. 349, quoting from *Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406].) It has also been suggested that this rule should be relaxed where the plaintiff has had no previous opportunity to propose an amendment. (Cf. *Eldridge* v. *Tymshare, Inc.* (1986) 186 Cal.App.3d 767, 778-779 [230 Cal.Rptr. 815]; cf. also 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 943, pp. 378-379.) But in any event no abuse of discretion should be found where there is no material dispute as to the facts, the applicable law is clear, and under the facts and the law the plaintiff cannot prevail: In such a case, "[o]bviously, no amendment would change the result." (5 Witkin, *supra,* § 945, p. 379; cf. *DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011, 1030; *B & P Development Corp.* v. *City of Saratoga* (1986) 185 Cal.App.3d 949, 962 [230 Cal.Rptr. 192].)

At oral argument we asked counsel for CAMSI IV what new facts relevant to the statute of limitations he could plead if given leave. Counsel's only response was to furnish us a copy of CAMSI IV's *third* amended complaint, filed a few days after the trial court stated its intention to sustain Hunter's demurrers to the second amended complaint. We shall assume CAMSI IV could plead nothing beyond what appears in its third amended complaint. In the course of oral argument we also asked counsel whether CAMSI IV had intended to plead a theory of *nuisance* (which in appropriate circumstances would be subject to more favorable limitations rules: cf. *Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 868-869 [218 Cal.Rptr. 293, 705 P.2d 866]; *Phillips* v. *City of Pasadena* (1945) 27 Cal.2d 104, 107-108 [162 P.2d 625]); counsel indicated that CAMSI IV had not pursued and would not pursue a nuisance theory.

The third amended complaint omits Hunter and the charging allegations against Hunter, and substantially revises allegations relevant to discovery. Among other things the third amended complaint alleges that the July 1985 order simply "mentioned the presence of unspecified amounts of TCE and other VOCs . . . . [T]he Control Board had no evidence that the levels of TCE and other VOCs on the Subject Property threatened the property or the public health, or that these contaminants existed at levels which required the Control Board to act. The Control Board further had no evidence of a source

of that discharge or release or the identity of a culpable party." The third amended complaint alleges that the July 1985 order contained "a crude map" that indicated "the suggestion of VOCs" was found near Monsanto facilities on the northern edge and near the middle of the parcel, inferably some distance from Hunter's site at the southeast corner of the parcel. The map "graphically illustrated that the Control Board was not directing its attention to the area of the Subject Property on which Hunter had operated between 1968 and 1983. The finding of TCE in the area covered by the July 1985 Order has never been confirmed. No subsequent cleanup order has been issued specifying the existence or requiring the removal of TCE or VOC contamination from that area. [¶] . . . The July 1985 Order imposed no new obligations on CAMSI IV that it had not anticipated when it relied upon MONSANTO's representations in acquiring the Subject Property . . . . Therefore, CAMSI IV had no reason to believe that it was necessary to inquire further as to the source or the levels of the TCE and other VOCs in the HMBA area."

For three reasons we conclude these new allegations would have been insufficient to invoke the discovery rule and thus to avoid the bar of the three-year statute of limitations.

First, CAMSI IV's assertion that it "had no reason to believe that it was necessary to inquire further" must be disregarded as conclusionary. (Cf. *Saliter* v. *Pierce Brothers Mortuaries, supra,* 81 Cal.App.3d at p. 297.)

Second, in evaluating phrases, such as "mentioned the presence of unspecified amounts of TCE and other VOCs" and "the suggestion of VOCs," which are patently intended to minimize the inferable impact of the July 1985 order on CAMSI IV, we are of course at liberty to take into consideration the earlier pleading, verified or unverified. (5 Witkin, Cal. Procedure, Pleading, *supra,* §§ 1117-1118, pp. 533-536.) The second amended complaint alleged (for example) that the July 1985 order "mandated investigation of the groundwater and soil of the Subject Property, partly because *TCE and TCA and other VOCs had been found thereon and thereunder*" (italics added), and referred (for example) to the area "where the July 1985 Order had earlier reported *TCE concentrations*" (italics added). To the extent there may be factual inconsistency between comparable parts of the two pleadings, we may and shall refer to the stronger declarations included in the second amended complaint but omitted from the third amended complaint. (*Hills Trans. Co.* v. *Southwest Forest Industries, Inc.* (1968) 266 Cal.App.2d 702, 708-713 [72 Cal.Rptr. 441]; *Tostevin* v. *Douglas* (1958) 160 Cal.App.2d 321, 327-329 [325 P.2d 130].)

Third, the allegations of the third amended complaint would not in any event suffice to invoke the discovery rule. In our view, that the regional board so much as "mentioned the presence of unspecified amounts" of VOCs precluded any possible assertion that CAMSI IV would have been unable, by reasonable diligence, to have discovered the necessary facts at that time.

In sum, neither the allegations of record nor the allegations of the newly submitted third amended complaint, nor any other representation as to the surrounding circumstances, suggests that there is any substantial dispute as to the facts relevant to the statute of limitations. Even amended as CAMSI IV now suggests the complaint would not avoid the statutory bar. In denying leave to amend the trial court acted within the scope of its sound discretion.

The judgment in favor of Hunter Technology Corporation is affirmed. Hunter Technology Corporation shall recover its costs on appeal.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for rehearing was denied on July 2, 1991, and the following opinion was then rendered:

THE COURT.*— By petition for rehearing CAMSI IV asserts for the first time that the trial court abused its discretion by failing to grant it leave to amend to plead theories of continuing nuisance and continuing trespass against Hunter. To explain the apparent inconsistency between this position and counsel's statement at oral argument that CAMSI IV was not pursuing a nuisance theory against Hunter, CAMSI IV argues that until the Third Appellate District filed its opinion in *Mangini* v. *Aerojet-General Corp., ante,* page 1125 [281 Cal.Rptr. 827] (*Mangini*), after oral argument in this matter, "no published decision in California . . . had held expressly that a present property owner could sue a former tenant for a nuisance created on the owner's property" and therefore that *Mangini* "represents a change in the law."

In opposition to CAMSI IV's petition Hunter argues that CAMSI IV cannot amend its complaint to conform to *Mangini* and that in any event *Mangini*'s statement of pertinent law is incorrect. We need not address these contentions; in any event we deny the petition for two reasons.

---

*Before Agliano, P. J., Bamattre-Manoukian, J., and Capaccioli, J.

First, a reviewing court need not consider points raised for the first time on petition for rehearing. (9 Witkin, Cal. Procedure, Appeal, *supra*, § 684, pp. 656-657; Cal. Civil Appellate Practice (Cont.Ed.Bar 1985) § 18.8, pp. 497-498.) CAMSI IV has given us no reason to disregard this established principle in this case. We are wholly unpersuaded by CAMSI IV's contention that before *Mangini* it could not have pursued a nuisance theory. *Mangini* cites statutes that have been in our codes since they were adopted in 1872, and cases, some of which predated the codes. Counsel for CAMSI IV was necessarily aware of *Mangini*, and of the Third Appellate District's inclination to find viable claims against a tenant for nuisance and for trespass, at least a week before our oral argument, when counsel for CAMSI IV called to our attention the first opinion in *Mangini*, filed for publication nearly three months earlier (and subsequently vacated by grant of rehearing).

Second, within the constraints of our appellate function we would find no abuse of discretion. Even where there is no request for leave to amend (or where, as here, the only arguable request was wholly insufficient to suggest whether or how the plaintiff could amend) "the question as to whether or not [the trial] court abused its discretion" in denying leave to amend remains open on appeal. (Code Civ. Proc., § 472c.) But it is the *trial court's* discretion that is at issue; the reviewing court may only determine, as a matter of law, whether the trial court's discretion was abused. In our view an abuse of discretion could be found, absent an effective request for leave to amend in specified ways, only if a potentially effective amendment were both apparent and consistent with the plaintiff's theory of the case. Were we to accept CAMSI IV's premise that it could not have amended its complaint until the second *Mangini* opinion was filed, we could not consider the trial court's earlier denial of leave to amend an abuse of discretion. We reject CAMSI IV's premise, but we nevertheless find no abuse of discretion: Absent any indication whatsoever that CAMSI IV might wish to change theories, the trial court was by no means obliged to invite CAMSI IV to do so. There is a rational basis for hypothesis that (until it received this court's ruling) CAMSI IV would have been disinclined to shift to nuisance and trespass theories: For reasons well explained in *Mangini*, CAMSI IV could have avoided the bar of the statute of limitations only by pleading *continuing* nuisance and *continuing* trespass, but had it done so it would have limited its available relief in damages to harms shown to have accrued before its action was filed (which would not have included, for example, diminution in market value of the parcel). (Cf. *Spaulding* v. *Cameron* (1952) 38 Cal.2d 265, 267-270 [239 P.2d 625]; *Baker* v. *Burbank-Glendale-Pasadena Airport*

*Authority* (1985) 39 Cal.3d 952, 868-869 [218 Cal.Rptr. 293, 705 P.2d 866].) The trial court could rationally have regarded CAMSI IV's choice among theories as essentially tactical and not subject to interference by the court.

A petition for a rehearing was denied July 2, 1991, and appellant's petition for review by the Supreme Court was denied September 18, 1991.