Filed 1/4/23; Certified for Publication 1/26/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| VENTURA29 LLC,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN BUENAVENTURA,<br><br>  Defendant and Respondent. | 2d Civ. No. B313060<br>(Super. Ct. No. 56-2020-00539754-CU-EI-VTA)<br>(Ventura County) |

Ventura29, LLC, appeals from the judgment of dismissal entered after the trial court had sustained, without leave to amend, a demurrer to its second amended complaint (complaint). The demurrer was filed by respondent City of San Buenaventura (City).

In 2015 appellant purchased property (the Property) on East Thompson Boulevard in City. The complaint alleged that appellant "is in the process of developing a multi-unit townhome project" on the Property.

The complaint consists of four causes of action. The first cause of action is for inverse condemnation. Appellant claims City's modification of an approved grading plan for the Property "resulted in an unconstitutional taking for which [it] is entitled to just compensation." We conclude appellant forfeited its objections to the modification because it failed to exhaust its administrative remedies.

Appellant contends the complaint states causes of action for private nuisance, trespass, and negligence based on City's dumping of uncertified fill on the Property in 1977. We conclude these causes of action are barred by the statute of limitations. Accordingly, we affirm the judgment of dismissal.

*The Complaint*

The complaint alleged: "In 2006 the prior owner of the Property, V2V Ventures, Inc. ('V2V') received Tentative Tract Map approval from the City to construct 29 townhouses on the Property." "V2V . . . retained a geotechnical engineering firm, Earth Systems Pacific ('Earth Systems'), to conduct soils test on the Property . . . ." Appellant took title to the Property in 2015. It "is currently in the process of developing a 29-unit townhouse project . . . pursuant to the same City-approved Tentative Tract Map that V2V obtained in 2006."

In 2018 Earth Systems prepared a Geotechnical Engineering Report for appellant. The report is attached as Exhibit A to the complaint. The report noted that extensive uncertified fill was encountered in test trenches excavated on the Property.

City acknowledges that it approved a grading plan submitted by appellant. The complaint alleged, "[T]he Grading Plan states: 'recommendations and conclusions of [Earth

2

Systems' 2018 report], shall be thoroughly complied with. . . . [T]he mentioned report . . . [is] hereby . . . made a part of this grading plan.'"

As a condition of approving appellant's project, City required it "to construct a pedestrian-only walking path across [an adjoining] City-owned property [("the City Parcel" or "City's Parcel")] in order to connect [appellant's] property with a nearby City park." City acquired its parcel in 1967.

The complaint continued: "After commencing excavation for the project, . . . [appellant] soon discovered . . . that significant amounts of uncertified fill were buried to considerable depths under the entirety of the City [Parcel] where the walking path was to be constructed, as well as under a portion of [appellant's] property." "The buried materials consisted almost exclusively of concrete curb and gutter, concrete street sections, footings, asphalt and rebar, all of which are consistent with waste from public works projects."

Earth Systems proposed "an engineering solution . . . to use geofabric to stabilize the areas with uncertified fill located outside of the Project building pads as well as on the City Parcel where [appellant] was required to install a walking path." The City inspector, Burt Yanez, orally informed appellant that Brad Starr, the City Engineer, had rejected appellant's proposal. Yanez said "that [appellant] must excavate the Property and the entire City Parcel to native bottoms, otherwise the City would revoke all Project grading approvals."[1] "This requirement far

_____

[1] It is doubtful that Yanez said appellant must remove the uncertified fill over the entire City Parcel. The complaint later stated, "Plaintiff was not aware . . . that it would eventually be required to move all . . . fill buried under the . . . City Parcel

3

exceeded the extent of grading contemplated or required in the [approved] Grading Plan."

"At no time during or subsequent to this conversation did any City representative inform [appellant] that such a determination to deny [its] grading proposal might have been appealable to the City's Public Works Director pursuant to Municipal Code Section 12.210.030.[2]  [Appellant] had no idea . . . that such a remedy was potentially available.  In any event, it would have been infeasible to stop the Project in order to pursue an appeal due to extensive overhead costs, carrying cost and a balloon payment on a construction loan."

Appellant removed "approximately 80 million pounds of uncertified material, the great majority of which [was on] the City Parcel. . . .  [It] initially negotiated orally with City

_____

*where the walking trail was to be installed*."  (Italics added.)  In its brief appellant alleges, "[T]he City Engineer . . . made the demand that [appellant] remove all uncertified fill throughout the Property and the City Parcel *where the walking trail was to be installed*."  (Italics added.)

[2] City's Municipal Code Section 12.210.030 provides: "Appeals from permit conditions, or to allow alternate grading methods, or for other forms of relief from determinations or decisions by the City Engineer, may be made to the Public Works Director.  The appeal shall be filed within ten calendar days after the final action, determination, or decision by the City Engineer. The appeal shall be on forms as provided by the Public Works Director and shall specifically set forth the grounds for appeal and reason or basis for disagreement with the decision of the City engineer.  The Public Works Director shall have the authority to hear such appeals and grant exceptions to particular requirements of this Part 2, or approve alternative grading methods or permit conditions . . . ."

4

representatives for reimbursement or credits, and later submitted a request in writing through [its] counsel. All requests for reimbursement were denied."

Appellant hired a construction forensics firm, Xpera Group (Xpera), to research the uncertified fill. Xpera "concluded that the uncertified fill at issue is waste from City public works projects that was dumped on the City Parcel and the Property by the City in or around 1977 when the topography of the City Parcel changed from a steep drop off to a gradual slope."

"[Appellant's] causes of action . . . did not accrue until [its] discovery of the illegally placed uncertified fill in April 2019." "[Appellant] has incurred, and will continue to incur, in excess of $1,000,000 in additional Project costs related to the excavation of the uncertified fill and other debris, remediation, lost time, overhead, and interest payments to lenders and investors caused by the delay in the Project timeline."

The complaint consists of four causes of action: (1) inverse condemnation, (2) private nuisance, (3) trespass, and (4) negligence. The first cause of action alleged that City's dumping of uncertified fill on the Property and the City Parcel, along with City's requirement that appellant remove the fill, "result[ed] in a taking and damaging of the value of the Property in an amount in excess of $1,000,000." The second through fourth causes of action are based on City's dumping of uncertified fill on the Property and the City Parcel.

The complaint's prayer for relief requests "compensatory special damages" and "general damages."

*Demurrer: General Principles and Standard of Review*

"A demurrer tests the legal sufficiency of factual allegations in a complaint. [Citation.] A trial court's ruling sustaining a

demurrer is erroneous if the facts alleged by the plaintiff state a cause of action under any possible legal theory. [Citations.]" (*Lee Newman*, *M.D.*, *Inc. v. Wells Fargo Bank* (2001) 87 Cal.App.4th 73, 78.)

"[W]e apply the de novo standard of review in an appeal following the sustaining of a demurrer . . . ." (*California Logistics*, *Inc. v. State of California* (2008) 161 Cal.App.4th 242, 247.) "[W]e assume the truth of all facts properly pleaded in the complaint and its exhibits or attachments, as well as those facts that may fairly be implied or inferred from the express allegations. [Citation.] 'We do not, however, assume the truth of contentions, deductions, or conclusions of fact or law.' [Citation.]" (*Cobb v. O'Connell* (2005) 134 Cal.App.4th 91, 95.)

"The plaintiff has the burden of showing that the facts pleaded are sufficient to establish every element of the cause of action and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer as to the cause of action. [Citation.]" (*Martin v. Bridgeport Community Assoc.*, *Inc.* (2009) 173 Cal.App.4th 1024, 1031.)

When, as here, "a demurrer has been sustained without leave to amend, unless failure to grant leave to amend was an abuse of discretion, the appellate court must affirm the judgment if it is correct on any theory. [Citations.] If there is a reasonable possibility that the defect in a complaint can be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend. [Citation.] The burden is on the plaintiff . . . to demonstrate the manner in which the complaint might be amended." (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742.)

*Trial Court's Ruling on Cause of*
*Action for Inverse Condemnation*

"'To state a cause of action for inverse condemnation, the property owner must show there was an invasion or appropriation (a "taking" or "damaging") [by a public entity] of some valuable property right which the property owner possesses . . . and the invasion or appropriation directly and specially affected the property owner to his injury.'" (*City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 221.)

Appellant argues that the complaint states a cause of action for inverse condemnation based on the City Engineer's modification of the grading permit to require the removal of the uncertified fill on the Property and the City Parcel. Appellant asserts: "[Th]e City imposed an illegal development condition . . . ." "This substantial verbal modification completely changed the scope of [appellant's] project as approved by the City, and unquestionably resulted in an unconstitutional taking for which [it] is entitled to just compensation."

The trial court concluded that appellant's cause of action for inverse condemnation was barred because it had not exhausted its administrative and judicial remedies: "[Appellant] had a means of challenging the oral modification of the permit. [It] could have refused to comply and administratively appealed from the revocation of the grading permit. Alternatively, [it] could have filed a petition for writ of mandate in the superior court challenging the illegal (i.e., oral) modification of the grading permit. . . . [¶] But having accepted the benefits of the permit issued it without resorting to the available means of contemporaneously challenging it, [appellant] may not now sue for inverse condemnation."

7

*Doctrine of Exhaustion of Administrative Remedies*

"A demurrer may properly be granted based on the failure to adequately plead an exhaustion of administrative remedies. [Citation.]  A plaintiff must exhaust the administrative remedies available before resorting to the courts. . . . [¶]  Allowing the administrative agency or organization an opportunity to redress the alleged wrong without interference by the courts may make litigation unnecessary and relieve the courts of an unnecessary burden.  [Citation.]  Even if the plaintiff does not obtain complete relief, there may be partial relief that reduces the likelihood and scope of litigation.  [Citation.]  An administrative remedy ordinarily provides a more economical and less formal forum to resolve disputes and provides an opportunity to mitigate damages.  [Citation.]  The exhaustion requirement also promotes the development of a more complete factual record and allows the agency to apply its expertise, both of which assist later judicial review if necessary.  [Citation.]  All of these factors both promote judicial economy and afford due respect to the administrative or organizational dispute resolution process." (*Shuer v. County of San Diego* (2004) 117 Cal.App.4th 476, 482; see also *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321 ["'Exhaustion of *administrative* remedies is "a jurisdictional prerequisite to resort to the courts". . .'"]; *McKart v. United States* (1969) 395 U.S. 185, 195 ["A complaining party may be successful in vindicating his rights in the administrative process.  If he is required to pursue his administrative remedies, the courts may never have to intervene"].)

"The exhaustion doctrine has certain exceptions. [Citation.]  The doctrine does not apply when the administrative remedy is inadequate.  [Citation.] For example, it does not apply

8

when the administrative procedure is too slow to be effective [citation], or when irreparable harm would result by requiring exhaustion of administrative remedies before seeking judicial relief [citations], or when it is clear that seeking administrative remedies would be futile [citation]." (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 609.)

*The Trial Court Did Not Err in Sustaining the*
*Demurrer for Failure to Exhaust Administrative Remedies*

Municipal Code section 12.210.030 provided appellant an administrative remedy – an appeal to City's Public Works Director – but appellant did not avail itself of this remedy. (See *ante*, fn. 2 at p. 4.) The complaint explained, "[I]t would have been infeasible to *stop the Project* in order to pursue an appeal due to extensive overhead costs, carrying cost and a balloon payment on a construction loan." (Italics added.) "The cost . . . to *stop work on the Project* was infeasible and would have resulted in catastrophic losses." (Italics added.)

The above-quoted explanation for not exhausting administrative remedies is based on the conclusion that the pursuit of an appeal to the Public Works Director would have required appellant to stop work on the project. This is a conclusion of fact that we do not accept as true. "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.)

If appellant had appealed, while the appeal was pending it could have removed the uncertified fill where the buildings were to be constructed and within a three-foot distance from the buildings' foundations. The removal of this fill would have been

9

mandatory even if the City Engineer had not modified the grading plan.  In its brief appellant notes that Earth Systems' approved "Grading Plans only required excavation to native bottoms below the building foundations and in a 3-foot perimeter around the foundations."[3]

If the appeal had not been decided by the time this required excavation was completed, appellant could have started to excavate the remainder of the Property.  The excavation of the City Parcel would have been left for last.  The complaint alleged that "the great majority of [the 80 million pounds of uncertified fill] was removed from the City Parcel."

Thus, appellant had nothing to lose by filing an appeal.  We reject its claim that "time-sensitive construction . . . would have come to a grinding halt with no forward progress until an . . . appeal right was exhausted."  The claim is contradicted by appellant's contention that it "would have immediately appealed the [City Engineer's] determination to at least preserve its rights

_____

[3] Earth Systems recommended: "The existing ground surface *within the construction limits of the proposed building* should be initially prepared for grading by removing all . . . non-complying fill."  (Italics added.)  "Due to the presence of artificial fill soils, overexcavation and recompaction of soils *in the building areas* will be necessary to decrease the potential for settlement and provide more uniform bearing conditions.  Soils should be overexcavated to the deeper depth of either 2.5 feet below the bottom of the deepest foundation element of mat and post-tensioned slab foundations or through all uncertified fill.  *Remedial excavations should be performed to a distance of at least 3 feet laterally beyond the outside edge of the foundation elements*, if possible."  (Italics added.)

10

had it known the City intended the Engineer's determination to be appealable."

The complaint assumes that an appeal would have been a protracted affair. This is speculation. We do not know how long the appeal would have taken. Since the grading of the Property was underway, appellant justifiably could have requested an expedited appeal.

There is no reason why an appeal could not have been expeditiously decided. City's appellate procedure is simple and straightforward. The complaining party appeals to the Public Works Director. "The appeal shall be on forms as provided by the Public Works Director and shall specifically set forth the grounds for appeal and reason or basis for disagreement with the decision of the City [E]ngineer." (Muni. Code § 12.210.030.) "[T]he Public Works Director shall determine one of the following: 1. The City Engineer's decision was a reasonable interpretation of this Part 2 and that determination shall stand; or 2. Based on findings supported by substantial evidence: . . . There are alternate grading methods that will provide equivalent levels of protection of the public health and safety. Such alternates shall be specifically delineated in upholding the appeal." (*Ibid.*) The municipal code does not require the Public Works Director to conduct an evidentiary hearing. "The decision of the Public Works Director shall be final and there shall be no further appeal to the City Council or any City advisory body." (*Ibid.*)

If appellant had filed an appeal, the parties may have reached a compromise. In the absence of a compromise, we do not know what the Public Works Director would have decided. The Director was not bound by the City Engineer's decision. The Director may have accepted Earth Systems' alternative

11

mitigation measures, particularly under the pedestrian-only walking path on City's Parcel. The walking path would not be subjected to heavy loads.

At oral argument before this court, appellant's counsel insisted that it was unfair for the City Engineer to modify the approved grading plan after appellant had commenced grading the construction site. But in view of appellant's failure to appeal to the Public Works Director, it would be unfair to impose upon City an unexpected potential liability of more than $1 million for the cost of complying with the modification.

Permitting a developer to bring an action for damages without exhausting its administrative remedies would have a chilling effect on governmental regulation of new construction. Construction is a risky business. The developer can never be certain of what it will find when it grades the construction site. Unforeseen, subsurface conditions may be discovered. Their discovery may lead public officials to believe that modifications of approved plans are necessary to assure that the project is soundly constructed and does not compromise public safety. This is what happened here. Public officials will be loath to modify approved construction plans if, without seeking available administrative review, the developer may comply with the modifications, complete the project, and then recover from the government the cost of the modifications.

If appellant had filed an appeal, City would have been promptly alerted "'that [the City Engineer's] decision [was] being questioned' and [would have been] allow[ed] . . . to mitigate potential damages" and "propose alternative mitigation measures. . . . Land use planning decisions entail a delicate balancing of interests. An under protest exception to the general

12

waiver rule [in the present case] would upset this balance and inject uncertainty into the planning process." (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 480.) "If every owner who disagrees with the conditions of a permit could unilaterally decide to comply with them under protest, do the work, and file an action in inverse condemnation on the theory of economic coercion, complete chaos would result in the administration of this important aspect of municipal affairs." (*Pfeiffer v. City of La Mesa* (1977) 69 Cal.App.3d 74, 78, superseded by statute on other grounds as stated in *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 241.)

Appellant maintains that the City Engineers' oral modification of the grading plan "violated the City's Municipal Code," which required that the modification be approved in writing by the City Engineer. The complaint alleged: "The modification to the Grading Plan was imposed verbally [i.e., orally,] in the field, with no supporting documentation . . . ." But the absence of a writing does not excuse appellant's failure to exhaust its administrative remedies before bringing an action for inverse condemnation.

The complaint alleged appellant did not know it had a right to appeal the City Engineer's decision to the Public Works Director. "Ignorance of the law is no excuse. This maxim is so long standing and so well established that it is part of the very fabric of our legal system." (*Diaz v. Grill Concepts Services, Inc.* (2018) 23 Cal.App.5th 859, 869; see also *Tarrant v. Butler* (1960) 180 Cal.App.2d 235, 240 ["knowledge of the building and zoning laws will be imputed to a property owner"].) Appellant's ignorance is particularly inexcusable because it was a

13

sophisticated real estate developer. "Developers are sophisticated entities, capable of and expected to conduct due diligence to determine their rights and duties." (*North Murrieta Community, LLC v. City of Murrieta* (2020) 50 Cal.App.5th 31, 45.) Appellant never asked City officials if the City Engineer's decision was appealable or otherwise reviewable by higher authority.

*City Is Not Equitably Estopped*
*From Asserting a Forfeiture*

Appellant claims City is equitably estopped from asserting a forfeiture based on appellant's failure to exhaust administrative remedies because City did not inform appellant of its right to appeal. Appellant asserts: "[N]either the City Engineer nor any other City representatives ever said anything about [appellant's] right to an appeal." "The City's actions led [appellant] to believe, in good faith, that the City Engineer's determination was not one that could be appealed . . . ." "[T]he City's complete failure to apprise [appellant] of its alleged appeal rights constitutes a clear breach of the City's duty to inform applicants of remedies available to challenge adverse actions."

"The doctrine [of equitable estoppel] 'ordinarily will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy. . . .'" (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1315.) "'The doctrine . . . is founded on notions of equity and fair dealing and provides that a person may not deny the existence of a state of facts if that person has intentionally led others to believe a particular circumstance to be true and to rely upon such belief to their detriment. . . . "'Generally speaking, four elements must be

14

present in order to apply the doctrine . . . : (1) the party to be estopped must be apprised of the facts; (2) *he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended*; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."'"" (*McGlynn v. State of California* (2018) 21 Cal.App.5th 548, 561, italics added.) Nothing in the record suggests that City officials intentionally led appellant to believe that the City Engineer's decision was not appealable or that City officials "so act[ed] that [appellant] had a right to believe [they had] so intended." (*Ibid.*) The issue of appealability was never discussed.

Appellant cites no authority imposing a duty upon City to inform a real estate developer of its right to appeal a decision by the City Engineer. In the absence of such a duty, an estoppel cannot be based on mere silence. "Generally speaking, '"mere silence on the part of a party will not create an estoppel unless he was under some obligation to speak, and a party invoking such estoppel must show that it was the duty of the other to speak, and that he has not only been induced to act by reason of such silence, but that the other had reasonable cause to believe that he would so act."'" (*Johnson v. Johnson* (1960) 179 Cal.App.2d 326, 330.)

Appellant quotes the following excerpt from Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group, Nov. 2022 update) ¶ 15.108: "'An agency can be estopped from relying on the exhaustion of remedies defense where it negligently *misadvised* the private party about the *need* to exhaust a remedy or because the agency made a party's *access* to that remedy difficult.'" City did not engage in such conduct.

15

*Uniwill v. City of Los Angeles Is Distinguishable*

Appellant contends, "This case fits squarely within the holding of *Uniwill v. City of Los Angeles* [(2004) 124 Cal.App.4th 537 (*Uniwill*)] . . . . The facts could not be more analogous . . . ." Based on *Uniwill*, appellant argues that its "decision to continue with the project did not function as a waiver of its right to sue the City for inverse condemnation."

*Uniwill* is distinguishable. There, the City of Los Angeles issued Uniwill a tentative tract map approving construction of a shopping center. Uniwill began construction of the project. After it had expended approximately $6.5 million, the city informed Uniwill that it "would not certify to the Advisory Agency that Uniwill had complied with the conditions of the Tentative Tract Map" unless Uniwill conveyed an easement, performed trenching work, and paid a fee. (*Uniwill*, *supra*, 124 Cal.App.4th at p. 540.) "Uniwill determined that it was economically unfeasible to stop the project and commence litigation to vindicate its rights. Consequently, Uniwill complied with the City's 'unlawful exaction' under protest and, after completing the project, filed suit in inverse condemnation." (*Ibid*.)

The trial court sustained the city's demurrer to Uniwill's complaint because pursuant to Government Code section 66499.37, "Uniwill was required to commence [but did not commence] an action or proceeding within 90 days after . . . it learned of the City's demand that Uniwill grant the . . . easement, and . . . its failure to do so barred the action." (*Uniwill*, *supra*, 124 Cal.App.4th at p. 542.) At the time of the trial court's decision, Government Code section 66499.37 provided, "'Any action or proceeding to attack . . . *the decision of an advisory agency*, appeal board or legislative body concerning a

16

subdivision, . . . or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 90 days after the date of such decision. . . .'" (*Id*. at p. 539, fn. 1, italics added.)

The Court of Appeal reversed because Uniwill's complaint "alleged that the City's demand that it grant . . . an easement . . . was not a requirement imposed by the Advisory Agency as a condition for the grant of permission to develop the property. Rather, it was merely a threat, uttered by a City representative . . . to deprive Uniwill of what it was legally entitled to, issuance of a Final Tract Map and a certificate of occupancy upon completion of the project in conformity with the governmental approvals already issued. [¶] The City cites no case in support of its contention that a threat issued by an agent of the City under the circumstances described above which results in the taking of private property must be challenged in an action or proceeding filed within 90 days of the threat." (*Uniwill, supra*, 124 Cal.App.4th at pp. 543-544.)

*Uniwill* has no bearing on the present appeal. *Uniwill* held that the 90-day filing deadline of Government Code section 66499.37 does not apply where, after approval of a tentative tract map and commencement of the project, the city demands that the developer comply with additional conditions but the demand constitutes a mere threat instead of a requirement imposed by the advisory agency. The present appeal does not involve the applicability of section 66499.37. Furthermore, in *Uniwill* the city did not contend that the developer had failed to exhaust its administrative remedies.

17

*Remaining Causes of Action Are*
*Barred by the Statute of Limitations*

The remaining causes of action are private nuisance, trespass, and negligence.  For these causes of action, the applicable statutes of limitations are one year for the presentation of a claim to the City (Gov. Code, § 911.2; see *Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1263), and three years for filing a civil action.  (Code Civ. Proc., § 338, subd. (b)); see *Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 979; *Cyr v. McGovran* (2012) 206 Cal.App.4th 645, 650.)

"The statute of limitations usually commences when a cause of action 'accrues,' and it is generally said that 'an action accrues on the date of injury.'" (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931.)  Based on the complaint, the statutes of limitations began to run "in or around 1977" when City dumped the uncertified fill on the Property and the City Parcel.  To avoid the bar of the statute of limitations, appellant relies on the discovery rule.  Appellant claims it did not discover the uncertified fill until April 2019.

"An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.  [Citations.]  [¶]  A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'  [Citations.]  Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807.)

"A plaintiff whose complaint shows on its face that his or her claim would be barred by the applicable orthodox statute of limitations, and who intends to rely on the discovery rule to toll the orthodox limitation period, 'must specifically plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence. [Citations.] Mere conclusory assertions that delay in discovery was reasonable are insufficient and will not enable the complaint to withstand general demurrer. [Citation.]' [Citations.] Arguments that discovery-rule issues are necessarily factual and cannot be resolved on demurrer have been rejected." (*CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1536-1537 (*CAMSI*).)

The trial court ruled that the three remaining causes of action "are time-barred [by the statute of limitations] and that [appellant] has not pleaded facts bringing [them] with[in] the 'discovery rule.'" The court explained: "For purposes of the statute of limitations, the knowledge of [appellant's] predecessors [i.e., previous owners of the Property] is imputed to it. [Citation.] [Appellant] concedes that its 'predecessors as early as 2004 may have been aware of the existence of some uncertified fill located underneath some specific portions of the subject properties.' . . . [Appellant] does not vigorously resist the proposition that these three causes of action would have accrued by this time, if not sooner. Therefore, the limitations period would have expired prior to the time this action was commenced in 2020."

The trial court did not err. In the complaint appellant made allegations only as to its own lack of discovery. But if prior owners of the Property "knew or should have known that [City] had [dumped uncertified fill on the Property,] their knowledge

19

would have been imputed to [appellant]." (*CAMSI*, *supra*, 230 Cal.App.3d at p. 1537; see also *Bradler v. Craig* (1969) 274 Cal.App.2d 466, 472.) "In an action involving tortious injury to property, the injury is considered to be to the property itself rather than to the property owner, and thus the running of the statute of limitations against a claim bars the owner and all subsequent owners of the property. [Citations.] In other words, the statute of limitations does not commence to run anew every time the ownership of the property changes hands." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1216.)

The complaint "wholly fails to show that [prior owners of the Property] would have been unable, despite reasonable diligence, to have discovered" the uncertified fill. (*CAMSI*, *supra*, 230 Cal.App.3d at p. 1537.) In view of the enormity of the amount of fill (80 million pounds on the Property and the City Parcel), it is difficult to understand how the owner of the Property at the time of the dumping would not have been aware of it or would not have had reason to discover it. The complaint alleged that, because of the dumping, "[t]he topography of the City Parcel changed in or around 1977, from a steep approximately 20-foot drop-off to a gradual slope . . . ." The Xpera Report, attached as Exhibit D to the complaint, stated that in 1977 the dumping of fill "over the entire combined City Site and Project Site . . . created a manufactured slope across the boundary area of the Project Site and the City Site."

In the trial court appellant acknowledged "that the Property owner in 1977 and its successors possibly may have been aware that the City dumped material on the City Parcel and the Property." In a trench dug on the Property in 2006, Earth

20

Systems found "large amounts of debris ranging from blocks of concrete up to 2.5' [2.5 feet] in diameter to asphalt pieces up to 7' [7 feet] long."

Appellant maintains that, irrespective of whether its predecessors knew or had reason to know of the dumping of the uncertified fill, the causes of action are not time-barred because they do "not seek recovery for a direct injury resulting immediately from the . . . dumping . . . . The principal harm suffered by [appellant] was caused by the City's unforeseeable, unjustifiable and unlawful demand that [appellant] remove tons of the City's waste from the City's own property. [Appellant's] action for damages for the injury caused by the City's dumping of uncertified fill is not a traditional trespass upon real property, but rather in the nature of an *action upon the case* at common law for a consequential injury." (Italics added.) "[T]he statute of limitations only starts to run upon [appellant's] sustaining the consequential injury, and its knowledge thereof."

"The common law drew a distinction between two types of actions for injuries to real property. If the injury was an immediate and direct result of the act complained of, then an action for trespass was the appropriate remedy. On the other hand, where the damages did not immediately ensue from the act complained of, the damages were deemed to have been consequential, and the only remedy was an action 'on the case.'" (*Elton v. Anheuser-Busch Beverage Group, Inc.* (1996) 50 Cal.App.4th 1301, 1305; see also *Hicks v. Drew* (1897) 117 Cal. 305, 310 ["'where damages do not immediately ensue from the act complained of, it is consequential, and case is the proper remedy; and, on the contrary, where the act itself, and not the

21

consequence of it, occasions the mischief, trespass is the right action'"].)

Appellant's "action on the case" theory is based on its claim that the primary injury to its property was not caused by the dumping of the uncertified fill. Instead, it was caused by the consequences of the dumping, i.e., the City Engineer's unjustifiable modification of the grading permit to require appellant to remove the fill. Therefore, appellant argues, the statute of limitations on the causes of action began to run when the City Engineer made the modification.

The "action on the case" theory is of no assistance to appellant. The theory in effect restates the first cause of action for inverse condemnation. As we have explained at length *ante,* pages 8-16, appellant forfeited its right to object to the modification of the grading plan because it had complied with the modification without exhausting its administrative remedies.

*Disposition*

The judgment is affirmed. City shall recover its costs on appeal.

YEGAN, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

22

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Price, Postel & Parma and Timothy E. Metzinger, Todd A. Amspoker, Cameron Goodman, for Plaintiff and Appellant.

Olivarez Madruga Law and Thomas M. Madruga, Lloyd Pilchen, for Defendant and Respondent.

Filed 1/26/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| VENTURA29 LLC,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN BUENAVENTURA,<br><br>    Defendant and Respondent. | 2d Civ. No. B313060<br>(Super. Ct. No. 56-2020-00539754-CU-EI-VTA)<br>(Ventura County)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on January 4, 2023, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in judgment.

GILBERT, P. J.          YEGAN, J.          BALTODANO, J.