Filed 9/24/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DORIS ALEXANDER, et al., | B242458 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC435640) |
| v. | |
| EXXON MOBIL, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anthony Mohr, Judge. Reversed in part and affirmed in part.

David P. Bender, Jr., Caroline R. Hurtado and Michael J. Stoner, for Plaintiffs and Appellants.

Kaye Scholer, Larry Feldman, Peter Haviland and Robert Estrin, for Defendant and Respondent Exxon Mobil Corporation.

Parker, Milliken, Clark, O'Hara & Samuelian, Gary A. Meyer, Pedram F. Mazgani and Isaac B. Simon, for Defendants and Respondents the County of Los Angeles, Housing Authority of the County of Los Angeles and the Community Development Commission of the County of Los Angeles.

_____

**INTRODUCTION**

In April of 2010, over 700 plaintiffs filed a toxic tort action alleging injury from exposure to environmental contamination at a low-income housing complex constructed on a former oil storage facility. Defendants filed a demurrer arguing that the action was time-barred because the allegations in the complaint demonstrated plaintiffs knew, or should have known, of the environmental contamination several years before filing suit. The trial court sustained the demurrer without leave to amend against a subset of approximately 100 plaintiffs who admitted receiving notice of the contamination in 2007. The court concluded that although the notices suggested the contamination was not harmful, they were nonetheless sufficient to cause a reasonably prudent person to suspect that it might be so.

Fifty-eight of the dismissed plaintiffs join in this appeal, arguing that whether their causes of action accrued at the time they received notice of the environmental contamination raises a question of fact that is not amendable to resolution on demurrer. We agree and reverse the trial court's order of dismissal.

**FACTUAL AND PROCEDURAL BACKGROUND**

### A.  Background Facts[1]

Between 1924-1962, Exxon Mobil and its predecessors in interest (collectively Exxon) owned and operated the "Athens Tank Farm" (ATF), which was used to store gasoline and petroleum products. The ATF site contained "twenty-two 80,000 barrel steel above-ground storage tanks, two crude oil reservoir/sumps with a capacity of 1.8 million barrels, a pipeline pumping station and an absorption plant." During the course of operations, Exxon allowed millions of pounds of crude oil, gasoline and other

---

[1]     These background facts are based on the allegations in plaintiffs' fourth amended complaint, which we accept as true for the purposes of this appeal. (See *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 401 ["Because this case comes to us after entry of a judgment based on the sustaining of a demurrer, we accept as true the material allegations of plaintiffs' pleadings"].)

petroleum products to contaminate the soil and the groundwater in and around the ATF site. In 1962, Exxon ceased its operations at ATF and began to "decommission the facility to prepare it for sale."

Exxon eventually sold the ATF, which was then subdivided for residential use. In 1972, the Ujima Housing Corporation (Ujima Corporation) and several related entities constructed a low-income housing complex known as "Ujima Village Apartments" (Ujima) on a 16-acre parcel of the former ATF site. During construction, Ujima Corporation and its entities discovered two crude oil reservoir/sumps, oil saturated soils and petroleum-related debris, which they buried on the site.

The Ujima Corporation and its successors in interest owned and operated Ujima until the United States Department of Housing and Urban Development (HUD) foreclosed on the property in 1990. Before the foreclosure became final, HUD developed a plan to rehabilitate the property and sell it to a private entity. However, the purchaser withdrew from the sale negotiations after its environmental consultant reported that methane gas and hydrocarbons in the subsurface presented "'high potential for significant environmental impairment.'"

Between 1990 and 1995, HUD and its agents conducted several environmental investigations at the Ujima site. In 1991, HUD hired an environmental consultant to prepare a study "estimat[ing the] liability" associated with the "presence, past use or release of environmentally regulated materials." The study reported that the site was contaminated with "volatile organic compounds" (VOCS) in concentrations that "significantly exceeded the highest suggested action levels . . ." and recommended that additional investigations be performed to determine the extent of the contamination.

After initially rejecting those recommendations, HUD retained Earth Technology in 1993 to test the site for contaminants. Although the resulting report identified elevated concentrations of lead, mercury and other potentially harmful chemicals, it concluded that the contamination did not present a significant threat to the health or safety of Ujima residents. The Community Development Commission of the County of Los Angeles (CDC), however, hired a consultant to review Earth Technology's study. In December of

3

1993, the consultant issued a report that was highly critical of Earth Technology's methodologies and conclusions.

In or around 1994, the CDC and the Los Angeles County Housing Authority (collectively the County authorities) entered into negotiations with HUD to purchase Ujima. After reviewing the prior environmental investigations, the County authorities expressed concerns about potential "third party civil actions" and demanded that HUD provide indemnification coverage. HUD agreed to the proposal and sold Ujima to the Housing Authority for $1.00. The Housing Authority owned and operated Ujima from 1995 until its closure in 2009.

In May of 2005, the County authorities hired Rincon Consultants to conduct sampling of soil contamination, which revealed high concentrations of hydrocarbon vapors and VOCs that were consistent with a gasoline release. Rincon's report also revealed that "residents were at significant risk of exposure and cancer." Shortly thereafter, a private developer prepared a "Phase I Environmental Site Assessment Report" that confirmed contamination related to the release of petroleum hydrocarbons. Based on this report, two different developers decided not to purchase Ujima.

In October of 2006, the County authorities retained Rincon to conduct an overall evaluation of the site, which concluded that "'the possibility of a chronic health risk concern at th[e] site warrant[ed] additional study'" and that "'remediation [wa]s likely warranted . . . as a preventative measure to reduce possible exposure of VOC to residents [and] mitigate existing groundwater contamination underlying th[e] property.'" After the report was issued, the County authorities requested that the California Regional Water Quality Control Board (the Water Board) oversee all further investigations at Ujima.

On May 1, 2007, the Housing Authority sent a letter advising all Ujima residents that it was "considering the possibility" of closing the complex "due to the age and obsolescence of the property, the substantial economic cost of rehabilitation, and the significant disruption to the daily lives of residents to remediate environmental concerns." The letter stated that if the complex was closed, displaced residents might be eligible to receive federal relocation assistance payments. The letter emphasized,

4

however, that residents should not move out of the complex and urged them to "continue to pay [their] monthly rent." The letter further explained that residents would forfeit their right relocation assistance if they moved or were evicted before "receiving formal notice of . . . eligibility . . . ." The letter did not provide any further information about the "environmental concerns" at the property.

In June of 2007, the Housing Authority sent Exxon a letter requesting compensation for all costs associated with contamination at the site, including "third-party claims related thereto." The letter explained that testing had "identified gasoline and crude oil contamination in the soil and groundwater," which was "the direct result of the past use of the Premises as an oil storage tank farm." The Housing Authority informed Exxon that it would be "amenable to . . . having [Exxon] . . . undertake all appropriate assessment, monitoring, removal and remediation work" under the "purview and . . . approval of the [Water Board]." The letter also stated that it had received correspondence from a current Ujima resident that referenced "possible impacts of 'conditions of soil and water'" and requested that her family "be relocated as soon as possible for 'medical reasons . . . .'" The Housing Authority advised Exxon that "[b]ased, in part, on mitigating [this resident's] and other prospective third party claims, [it was] planning for the permanent relocation of all residents of [Ujima]."

In October of 2007, the Water Board met with the Ujima property manager and Rincon to discuss environmental remediation at Ujima. During the meeting, the Water Board emphasized the "urgent" need for an investigation that was sufficient to properly "evaluate the extent of contamination and potential risk to human health." The property manager encouraged the Water Board to "establish contact with [Exxon]" and indicated that it had "conducted a meeting with the tenants and informed them of the current status and the potential for near future evacuation."

On November 14, 2007, the Water Board issued a letter ordering Exxon to "complete environmental investigation, assessment, monitoring and cleanup at [Ujima.]" The letter explained that, since 1992, only "limited soil, soil vapor, indoor air and groundwater sampling ha[d] been conducted at the . . . site." Although the results of this

5

"limited sampling" had confirmed contamination "from the historical operations that occurred at ATF," the Water Board believed a more "complete environmental assessment of the contaminants . . . [wa]s required on an expedited basis." The letter ordered Exxon to conduct a "thorough investigation of the industrial operations conducted . . . at [Ujima]" and to prepare a "site-specific human health risk assessment . . . ." After receiving the order, Exxon retained one of its "prime [environmental] consultant[s]," Kleinfelder West, to conduct an investigation.

In April of 2008, the County authorities held community meetings for Ujima residents regarding the future closure of the site, relocation and the pending environmental remediation. During these meetings, which were attended by representatives of the County authorities, Exxon and the Water Board, fliers were distributed reporting that although contamination had been found at the site, the environmental conditions did not "pose adverse health and safety risks to the occupants."

On June 9, 2008, the Water Board sent an email to the County authorities and Exxon indicating that "review of preliminary shallow soil data" suggested that "'there does not appear to be immediate health concern . . . .'" Several days later, the County authorities and Exxon held another "relocation informational meeting" with Ujima residents and reported that "environmental investigation confirmed that there was no adverse risk to the health of the tenants."

In August of 2008, Kleinfelder issued a report concluding that "there was no adverse risk to human health from the contaminated subsurface soils and groundwater at or around [Ujima]." The report failed, however, to "properly evaluate, test address, raise and/or consider the actual health risk posed to [residents and neighbors of Ujima residents] as a result of the exposure to chemicals . . . ."

In December of 2008, the County Supervisors approved a motion to close Ujima as soon as possible; on April 14, 2009, the Supervisors issued a "declaration of blight" regarding the complex and directed the Housing Authority to evict remaining tenants.

6

### B. Prior Versions of Plaintiffs' Complaints and Trial Court's "Cottle" Order

In April of 2010, hundreds of former Ujima residents filed *Alexander v. Exxon Mobil* (Superior Court Case No. BC435640), which alleged numerous claims predicated on exposure to contamination at the housing complex. In April of 2011, a second set of plaintiffs, which was comprised of other former Ujima residents and individuals residing in nearby residential neighborhoods, filed a similar suit captioned *Davis v. Exxon Mobil* (Case No. BC460123). The trial court consolidated the matters and, on August 8, 2011, plaintiffs filed a "Consolidated Third Amended Complaint" (TAC). Over 700 plaintiffs joined in the TAC, which named 15 defendants including, Exxon, the County of Los Angeles, the CDC, the Housing Authority, Earth Technology, Ujima Corporation and numerous other private entities (we refer collectively to the government defendants as "County defendants" and the private defendants as "non-government defendants"). The TAC asserted a wide range of claims seeking compensation for injuries to both person and property.

The TAC included a subsection describing when plaintiffs allegedly discovered their claims. According to the complaint, plaintiffs had no reason to suspect the contamination at Ujima was harmful to their health until the Housing Authority issued its declaration of blight in May of 2009. Plaintiffs alleged that, prior to that time, respondents had repeatedly told Ujima residents that the contamination was not harmful. After seeing the declaration of blight, however, several individuals retained attorney Thomas Wire to investigate the matter further. Wire conducted an analysis of the "true condition of the contamination" and discovered that the "soil and groundwater . . . ha[d] continually posed a significant risk to human health and safety." The complaint further asserted that other groups of plaintiffs did not learn of the declaration of blight or the true dangers of the environmental contamination until October of 2009 and April of 2011.

Defendants filed a demurrer to the TAC arguing, in part, that plaintiffs' claims were untimely because the allegations in the complaint demonstrated, as a matter of law, that Ujima residents should have suspected that the contamination was capable of harming them many years before they filed suit. The County defendants separately

7

argued that a demurrer should be sustained in their favor because plaintiffs had failed to file a government claim letter within the time periods set forth in Government Code section 911.2.

At the demurrer hearing, the trial court informed the parties that although some of the plaintiffs might be time-barred, it needed more information to assess the issue: "There is a real question mark with respect to who should be a plaintiff and who should not be a plaintiff. Is there a statute of limitation problem? If so, as to whom. That's a very factual-driven question. And I appreciate that there are a lot of plaintiffs, but for each of these plaintiffs, we're going to have to . . . figure out how each person learned or should have learned as to what's going on. I appreciate that there was a letter or a notice that went out around [May of] 2007 . . . . I think it said there is no need to leave . . . it reasonably could be interpreted of saying there is no danger, if you will. But in 2009 when the area was declared [blight] at least, in my mind, that to me would be notice; that puts a person of inquiry. So there are some real statute of limitations questions here . . . ."

The court elected to "sustain all the demurrers with leave to amend," explaining that plaintiffs needed to provide "a much better drawn complaint."[2] The court further explained that "with respect to the statute of limitations arguments[,]" it might enter an order "pursuant to . . . *Cottle versus Superior Court* [(1992) 3 Cal.App.4th 1367 (*Cottle*)]" requiring each plaintiff to provide "an offer of proof as to . . . [w]hat the person learned and when. Who they learned it from. Did they read something? Were they told something in detail? What did they hear? You known and then what did they do after that [¶] . . . [¶] that's what a *Cottle* order is all about."

After further discussion, the court ordered plaintiffs' counsel to "submit offers of proof [with the next amended complaint] regarding each and every plaintiff . . ." showing, among other things: "where they lived during the relevant time period, . . . the exact factual circumstances in which each person learned about the contamination,

---

[2]     The trial court sustained the demurrer without leave to amend as to various causes of action and categories of plaintiffs that are not relevant to this appeal.

8

whether that person has experienced any physical or psychological injury. If they haven't, what medical evidence corroborates their fear [of developing cancer]." The court then entered a minute order sustaining the demurrers to the TAC with leave to amend and ordering each plaintiff to submit a "*Cottle* declaration" containing each of the categories of information the court had referenced during the hearing.**3**

### C. Fourth Amended Complaint

#### 1. Summary of the Fourth Amended Complaint

On January 31, 2012, plaintiffs filed the operative fourth amended complaint, which incorporated over 800 *Cottle* declarations that were submitted as appendices. The

---

**3** In *Cottle, supra,* 3 Cal.App.4th 1367, a trial court presiding over a complex toxic tort action entered a case management order requiring each plaintiff to submit a statement providing prima facie evidence of the nature of plaintiff's injuries and the identity of each medical expert who would support the personal injury claim. (*Id.* at p. 1381.) Although the court gave plaintiffs multiple opportunities to comply with the order, none of them were able to provide any medical evidence that their personal injuries had been caused by the contamination. Immediately before trial, the court entered an order excluding any evidence of plaintiffs' physical injuries. The appellate court upheld the use of these procedures, explaining that "in a complex litigation case . . . a court may order the exclusion of evidence if the plaintiffs are unable to establish a prima facie claim prior to the start of trial." (*Id.* at p. 1381.) The court further stated, however, that "the timing of the order [wa]s crucial to its legitimacy," emphasizing that if "the order [had] been made earlier in the proceedings, we would be more inclined to hold that the order was an abuse of the court's discretion." (*Id.* at p. 1380.)

Although other courts have approved *Cottle's* holding that "a trial court may use its inherent powers to manage complex litigation by ordering the exclusion of evidence if the plaintiff is unable to establish a prima facie case prior to the start of trial" (*Lockheed Martin Corp. v. Continental Ins. Co.* (2005) 134 Cal.App.4th 187, 211-212 [disapproved on other grounds in *State v. Allstate* (2009) 45 Cal.4th 1008, 1036 fn. 11]), we are not aware of any authority that has approved the use of a *Cottle*-type procedure at the demurrer stage. (See e.g., *Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 300-301 [explaining that "the *Cottle* court [did not] have before it an order requiring the plaintiffs to establish a prima facie case of causation before discovery was complete and before a trial date had been set"].) While we have significant concerns about a procedure requiring detailed sworn affidavits at the pleading stage, plaintiffs have not raised any issue regarding the trial court's "*Cottle*" order. We will therefore proceed as if the order were valid.

9

complaint included an amended section explaining when the plaintiffs had discovered their claims. Plaintiffs alleged that, in or around September or October of 2008, plaintiff Eric Smith informed his former attorney, Tom Wire, that "individuals residing at [Ujima] were suffering from sickness and disease, and dying. [Smith] did not know, or suspect, the cause of these injuries." Based on his conversations with Smith, Wire began researching the "site history," but was "unable to discover evidence which suggested that [Ujima] posed a risk to human health and safety. Nevertheless, based on his research, [Wire] began to investigate whether the injuries at [Ujima] were caused by contamination resulting from the historic operations of the ATF, or from other causes."

In October of 2008, Wire allegedly met with a group of former Ujima residents and "related his suspicions that [Ujima] may be contaminated, and that such contamination may pose a serious risk to human health and safety. This was the first point at which these residents had been informed that [Ujima] may pose a serious risk to human health and safety." The complaint further asserted that, following the meeting, "suspicions regarding the potential threat to human health and safety at [Ujima] . . . began to spread, beginning in or around October, 2008 and continuing until the present, by word of mouth. As word of mouth spread, plaintiffs were told to contact Mr. Wire about their rights regarding [Ujima]." Wire allegedly held several meetings between October 2008 through 2011 informing more and more residents of his suspicions.

The complaint also alleged that each plaintiff's incorporated *Cottle* declaration "identif[ied] the time and manner in which each Plaintiff began to actually suspect that the contamination posed a serious risk to human health and safety at [Ujima Village] or the [surrounding community]." Most of the plaintiffs' declarations asserted they had discovered the contamination might be harmful to their health either through speaking with Tom Wire in late 2008, or by speaking to a friend or family member who had learned of the harmful contamination at some point between 2009 and 2011.

Although the complaint did not describe what information had caused Wire to suspect the contamination might be harmful (or when, specifically, he obtained the information), paragraph 24 of the complaint alleged, "[e]xpert scientific opinion indicates

10

that contamination at [Ujima] has posed, and continues to pose, a risk to human health and safety." It further alleged that many plaintiffs had experienced "adverse effects" "consistent with the toxicities, of the chemicals present at[Ujima]" and that, "to a reasonable scientific certainty, it is more likely than not that some people who lived at [Ujima] will contract cancer and experience other non-cancer adverse effects as a direct result of their exposure to toxic substances . . ."

As with the prior versions of the complaint, the fourth amended complaint asserted a wide range of personal injury and property claims against the County defendants, Exxon and numerous other non-government defendants. The claims included, in part, negligence, trespass, nuisance, public nuisance, breach of the warranty of habitability, statutory violations and wrongful death. In addition, several plaintiffs who lived in an adjacent residential neighborhood asserted claims for exposure to contamination in their community that had allegedly migrated from Ujima.

### 2. *Exxon and County defendants' demurrers to the fourth amended complaint*

The County defendants and Exxon filed demurrers to the fourth amended complaint arguing, among other things, that plaintiffs' allegations demonstrated that every claim set forth in the complaint was precluded by the two-year statute of limitations set forth in Code of Civil Procedure section 340.8, which applies to civil actions "based upon exposure to a hazardous material or toxic substances." (Code of Civil Proc., § 340.8.)

County defendants contended that the following statements in the complaint showed, as a matter of law, that every plaintiff knew or should have known of their claims more than two years before the first suit was first filed in April of 2010: (1) it was well-known that Ujima was located a on a former oil tank farm; (2) the property was subjected to repeated environmental testing between 1992 and its closure in 2009; (3) defendants held several meetings in 2007 to discuss the reasons for the proposed closure of Ujima; (4) on May 1, 2007, the Housing Authority sent a letter to Ujima residents that referenced "environmental concerns"; (5) in May of 2007, an Ujima resident expressed

11

health concerns to the Housing Authority regarding the contamination. According to defendants, these facts, "taken alone or in concert, unequivocally demonstrate[d] that Plaintiffs had been apprised of the environmental conditions at the site, and were on inquiry notice of any potential claims . . . years prior to the . . . claims bar date." The County defendants further argued that these same allegations demonstrated plaintiffs had failed to file their government claims letter within the time periods set forth in Government Code section 911.2.**4**

Exxon's demurrer presented similar arguments, asserting that plaintiffs' allegation that they "had no idea about any of the environmental concerns at [Ujima] until . . . [attorney] Wire began to tell them in October of 2008 is contradicted by the [complaint's] allegations and exhibits." Exxon contended that, based on the numerous environmental studies that had been conducted at the site between 1992 and 2007, it was "inconceivable that Plaintiffs could have lived at [Ujima] and not realized that the testing . . . occurred." Exxon also argued that any resident who had received a copy of the May 1, 2007 letter or attended any meeting referencing environmental remediation was, at that point, necessarily on notice of their claims.

In support of their demurrer, the County defendants prepared several exhibits listing plaintiffs whose *Cottle* declarations admitted they had either received the Housing Authority letter dated May 1, 2007 or attended community meetings regarding the proposed closure of Ujima. Exxon provided a similar exhibit listing plaintiffs whose *Cottle* declarations demonstrated one or more of the following: (1) the plaintiff had received the May 1, 2007 Housing Authority letter; (2) the plaintiff admitted being aware of the contamination in 2008, but failed to file a claim until 2011; (3) the plaintiff had admitted attending meetings regarding the relocation in 2007 or 2008.

---

**4**     Government Code sections 911, *et seq*., require that, before suing a public entity, a plaintiff must present a government claim letter to the appropriate public entity within the time limits set forth in section 911.2.

12

### 3. *Hearing on the demurrers to the fourth amended complaint*

At the demurrer hearing, the County defendants argued that "the plethora of concessions and admissions [in the complaint] and [the incorporated exhibits] makes it such that there's no way that any plaintiff wouldn't know that there was contamination," which was sufficient to trigger the statute of limitations. The trial court asked counsel to clarify whether he was arguing that, regardless of whether a plaintiff was told "there's no risk [from the contamination], the fact that . . . [contamination] is being discussed suffices to put them on notice." Counsel confirmed that was the County defendants' position.

Plaintiffs' counsel, however, argued that any notices plaintiffs had received regarding the contamination were not sufficient to trigger the statute of limitations for their personal injury claims because each notice had been accompanied by information indicating that the pollutants posed no risk to human health or safety health. Counsel contended that "When you're told there's nothing wrong and you reasonably believe it, you're not on notice." The court, however, rejected the argument, explaining: "When you read investigation and cleanup on the [letter or meeting] agenda and the goal is to provide an opportunity for community members to learn about the investigation of soil and ground water, to talk with agencies and people involved of the environmental investigation . . . I think it's putting them on notice."

The court thereafter sustained the demurrers without leave to amend as to approximately 100 plaintiffs whose *Cottle* declarations admitted they had received some form of notice of the contamination more than two years before filing their claims. The court sustained the remainder of the demurrers, which challenged the claims of hundreds of other plaintiffs on alternative grounds, with leave to file a fifth amended complaint. On May 8, 2012, the court issued a written order of dismissal stating, in part: "The Plaintiffs identified in Exhibit E[5] hereto are hereby dismissed with prejudice as to all Defendants because their declarations submitted as Appendices to the Consolidated

---

**5** The names of the plaintiffs listed in Exhibit E of the order match the names listed in the exhibits that Exxon and the County defendants had provided to the court in support of their demurrers.

13

Fourth Amended Complaint show that their Claims are barred by applicable statute of limitations." Fifty-eight plaintiffs listed in Exhibit E to the trial court's written order filed a timely appeal. (*See Safeco Insurance Co. v. Tholen* (1981) 117 Cal.App.3d 685, 691, fn. 2 [order of dismissal predicated on prior order sustaining demurrer without leave to amend as to three of six defendants constituted appealable order]; *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1396 [although "[a]n order sustaining a demurrer without leave to amend is not appealable . . . , an appeal is proper . . . after entry of a dismissal on such an order"]; Code Civ. Proc., §§ 581d, 904.1, subd. (a)(1).)

## DISCUSSION

The 58 appellants argue that the trial court erred in concluding that their personal injury claims against Exxon and the other non-government defendants are precluded by the applicable statute of limitations based on their admission that they received notice of the environmental contamination more than two years before filing suit. A subset of 15 appellants additionally contend that the trial court erred in dismissing their claims against the County defendants for failing to file a government claim letter within the time periods set forth in Government Code section 911.2.

### A. The Trial Court Erred in Dismissing Appellants' Personal Injury Claims Asserted Against Exxon and the Other Non-Government Defendants

With the exception of three appellants (whose claims we discuss in a separate section), each appellant submitted a *Cottle* declaration admitting that they either received a letter from the Housing Authority dated May 1, 2007 referencing "environmental concerns" at Ujima, or attended a community meeting in 2007 regarding the possible closure of Ujima. The trial court concluded these admissions showed appellants knew (or should have known) of the environmental contamination in 2007, and that, as a matter of law, such knowledge was sufficient to trigger their statute of limitations period under California's "discovery rule." Appellants argue, however, that whether the notices they

received in 2007 were sufficient to put them on inquiry notice of their personal injury claims is a question of fact that may not be resolved on demurrer.**6**

### 1. *Standard of review*

" We review de novo a trial court's sustaining of a demurrer, exercising our independent judgment as to whether the complaint alleges sufficient facts to state a cause of action. [Citation.] We assume the truth of properly pleaded allegations in the complaint and give the complaint a reasonable interpretation, reading it as a whole and with all its parts in their context." (*Van De Kamps Coalition v. Board of Trustees of Los Angeles Community College Dist*. (2012) 206 Cal.App.4th 1036, 1043.) Our consideration of the facts alleged includes "those evidentiary facts found in recitals of exhibits attached to [the] complaint." (*Satten v. Webb* (2002) 99 Cal.App.4th 365, 375.) "We also consider matters which may be judicially noticed." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591; see Code Civ. Proc., § 430.30, subd. (a) [use of judicial notice with demurrer].)

### 2. *Summary of applicable legal principles*

"A complaint disclosing on its face that the limitations period has expired in connection with one or more counts is subject to demurrer. [Citation.]" (*Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 962, as modified June 24, 2013 at 217 Cal.App.4th 336b (*Fuller*).) "The limitations period . . . runs from the moment a claim accrues. [Citations.] Traditionally at common law, a 'cause of action accrues "when [it] is complete with all of its elements" – those elements being wrongdoing, harm, and causation.' [Citation.] This is the 'last element' accrual rule: ordinarily, the statute of limitations runs from 'the occurrence of the last element essential to the cause of action.' [Citations.]" (*Aryeh v. Canon Business Solutions, Inc*. (2013) 55 Cal.4th 1185, 1192.)

---

**6** Although the fourth amended complaint asserts a wide range of claims against the government defendants for injuries to both person and property, appellants' brief focuses exclusively on their "bodily injury claims." Accordingly, our analysis is limited to appellants' personal injury claims and we deem all other types of claims to be abandoned.

"An important exception to the general rule of accrual is the 'discovery rule[.]'" (*Fox v. Ethicon Endo-Surgery, Inc*. (2005) 35 Cal.4th 797, 807 (*Fox*).) "'A cause of action under this discovery rule accrues when "'plaintiff either (1) actually discovered his injury and *its negligent cause* or (2) could have discovered injury and *cause* through the exercise of reasonable diligence [italics added].'" [Citation.] The limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry. [Citation.] Subjective suspicion is not required. If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation. [Citation.]'" (*McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 108.)

Thus, a two-part analysis is used to assess when a claim has accrued under the discovery rule. The initial step focuses on whether the plaintiff possessed information that would cause a reasonable person to inquire into the cause of his injuries. Under California law, this inquiry duty arises when the plaintiff becomes aware of facts that would cause a reasonably prudent person to suspect his injuries were the result of wrongdoing. (*Fox, supra,* 35 Cal.4th at p. 808 ["to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes"].) If the plaintiff was in possession of such facts, thereby triggering his duty to investigate, it must next be determined whether "such an investigation would have disclosed a factual basis for a cause of action[.] [T]he statute of limitations begins to run on that cause of action when the investigation would have brought such information to light." (*Fox, supra,* 35 Cal.4th at pp. 808-809.)

"In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.' [Citation.]" (*Fox, supra*, 35 Cal.4th at p. 808.)

16

"When a plaintiff reasonably should have discovered facts for purposes of the accrual of a case of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence (or, in this case, the allegations in the complaint and facts properly subject to judicial notice) can support only one reasonable conclusion." (*Broberg v. Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 921 (*Broberg*); see also *Czajkowski v. Haskell & White* (2012) 208 Cal.App.4th 166, 175-176 ["[T]he question of when 'a plaintiff reasonably should have discovered facts for purposes of the accrual of a case of action or application of the delayed discovery rule' [may] be decided as a matter of law'" only "if the undisputed facts do not leave any room for reasonable differences of opinion"].)

3. *The trial court erred in ruling that, as a matter of law, appellants' duty to investigate their personal injury claims arose when they received notice of the environmental contamination in 2007*

The parties do not dispute several aspects of the statute of limitation question presented here. First, the parties agree that appellants' personal injury claims are governed by Code of Civil Procedure section 340.8, which states in relevant part: "in any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." (Code Civ. Proc., § 340.8.) The parties further agree that the language of section 340.8 is not intended to create a special discovery rule of accrual for claims predicated on exposure to hazardous substances, but rather to clarify that California's traditional discovery rule applies to such claims.[7] (See Historical and Statutory Notes, 13C West's

---

[7] Neither party has addressed the applicability of section 309 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 *et seq*.), which states: "In the case of any action brought under State law for

Ann. Code of Civ. Proc. (2006 ed.) § 340.8, p. 248 [Legislature's intent in passing § 340.8 was to "codify . . . [prior] rulings" that had applied California's traditional discovery rule in hazardous exposure cases].)

The parties also do not dispute that: (1) without the benefit of the discovery rule, appellants' personal injury claims would be time barred; and (2) the operative complaint (which incorporates all the *Cottle* declarations) pleads sufficient facts showing the time and manner of each appellants' alleged discovery date. They disagree, however, as to whether the pleaded facts demonstrate appellants could have reasonably discovered their claims in 2007, which was more than two years before the first suit was filed.

---

personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute." (42 U.S.C. § 9658, subd. (a)(1).) Section 309, which appears at 42 U.S.C. § 9658, defines the term "federally required commencement date" as the "date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." (*Id.* at § 9658, subd. (b)(4)(A).) "The effect of this provision is to ensure that if a state statute of limitations provides a commencement date for claims of personal injury resulting from release of contaminants that is earlier than the commencement date defined in [section] 9658, then plaintiffs benefit from the more generous commencement date." (*O'Connor v. Boeing North American, Inc.* (9th Cir. 2002) 311 F.3d 1139, 1146 (*O'Connor*); see also *Angeles Chemical Co. v. Spencer & Jones* (1996) 44 Cal.App.4th 112, 123.) The Ninth Circuit has previously held that section 9658's federal commencement date applies to California state law claims predicated on exposure to toxic substances. (*O'Connor, supra*, 311 F.3d at p. 1149.)

For the purposes of this appeal, however, it is unnecessary to determine whether plaintiffs' claims are subject to the federal commencement rule. The text of section 9658 makes clear that the federal rule applies only if it would provide the plaintiff a more generous accrual date than he or she would otherwise enjoy under state law. Because we conclude appellants' claims for personal injuries are not, as a matter of law, precluded under the discovery rule set forth in section 340.8, it is immaterial whether section 9658 would have provided them a more generous commencement date.

18

Respondents argue that, as a matter of law, each appellant had a duty to begin investigating his or her claims after receiving notice of the environmental contamination in 2007, and that such an investigation would have disclosed a factual basis for the claims outside the applicable limitations period. Appellants, on the other hand, concede that if they had begun an investigation in 2007, they would have discovered their claims more than two years before they filed suit.[8] They contend, however, that there is a question of fact as to whether the information they possessed regarding the contamination in 2007 would have caused a reasonably prudent person to suspect that the contamination posed a risk to their health, thereby triggering their duty to investigate.

> a. *Summary of notices appellants received regarding contamination at Ujima*

Before assessing whether the notices appellants received in 2007 were sufficient to trigger their duty to investigate, we first summarize the nature of the information that was provided in those notices. A significant majority of appellants (48) provided *Cottle* declarations admitting that, on or around May 1, 2007, they received a letter from the Housing Authority referencing "environmental concerns" at Ujima. The first sentence of the letter notified residents that "the [Housing Authority] [wa]s considering the possibility [of closing Ujima] . . . due to the age and obsolescence of the property, the substantial economic cost of rehabilitation, and the significant disruption to the daily lives of residents to remediate environmental concerns at . . . the housing complex." No other information was provided regarding the unspecified "environmental concerns" or the reasons for Ujima's possible closure.

---

**8** The allegations in the fourth amended complaint impliedly admit that appellants' discovered a factual basis for their claims shortly after beginning an investigation. The complaint states that, in October of 2008, plaintiffs' attorney, Thomas Wire, was notified of the injuries at Ujima in October of 2008 and, within the same month, conducted an investigation that resulted in producing a factual basis for appellants' claims. Although the complaint does not identify what information Wire discovered during his investigation, the allegations nonetheless demonstrate that, once started, the investigation, quickly provided a basis for the claims.

The remainder of the letter discussed federal "relocation assistance" that might be made available to each resident in the event of closure. The letter, which included a pamphlet about relocation assistance, repeatedly warned residents that they should not move from the premises until they received an actual notice indicating that they were eligible for relocation assistance. In multiple parts of the letter, residents were told that if they moved or signed a new lease before receiving such a notice, they would risk forfeiting their right to federal assistance.

Seven other appellants submitted *Cottle* declarations stating that although they did not receive the May 2007 letter, they had attended a "community meeting" more than two years before filing suit, in April of 2007. They also admitted having attended one or more community meetings held on April 10, April 14 or June 13, 2008, each of which occurred within the two-year limitations period. Neither the *Cottle* declarations nor the fourth amended complaint contain any information explaining what was discussed at the April 2007 community meeting. The pleadings do, however, allege that, during the April 2008 meetings, respondents distributed flyers to residents informing them that "HUD found remaining gasoline and crude oil in [the] soil" and that "recent study with new technology confirms soil and ground water contamination." The flyer, which is included as an exhibit to the complaint, also stated that the contamination did "not pose adverse health and safety risks to the occupants" and that "air samples collected inside and outside of apartments cause no violation of state or federal standards." The *Cottle* declarations indicate that similar representations were made during the June 13, 2008 community meeting, at which time residents were told the contamination "was not harmful [to residents] and it was not the reason for the relocation."

At the demurrer hearing, the trial court ruled that although none of the pleadings or declarations described what occurred at the "unspecified [April] 2007 meetings," it could be fairly inferred that residents received the same information that had been provided at the subsequent meetings in 2008. The court explained that because its *Cottle* order had instructed plaintiffs to provide information about when they learned of environmental concerns at Ujima, plaintiffs would have had no reason to include

20

statements about the April 2007 community meeting unless they believed the topic of contamination was discussed at that time. We assume, for the purposes of this appeal, that the court's inference was proper.[9]

The respondents do not dispute that, to the extent contamination was discussed in April of 2007, residents were specifically informed that the contaminants posed no risk to their health. Indeed, respondents maintain that Ujima residents have always been told that the contamination poses no risk to human health because, in their view, it has never posed any such risk.

In sum, based on the parties' admissions and the trial court's findings, the appellants' complaint and their incorporated *Cottle* declarations allege that they received one of two forms of notice regarding the contamination more than two years before filing their claims: (1) a letter informing residents that although Ujima might be closed due to economic and environmental concerns, they should remain in their homes until they received a notice regarding eligibility for federal relocation assistance; or (2) statements at a community meeting indicating that although contamination had been found on the premises, it presented no risk to human health.

> b. *The notices of environmental contamination were not sufficient*
> *to place appellants on notice of their personal injury claims*

The trial court concluded that, as a matter of law, any plaintiff who received either form of notice should have suspected that the contamination posed a risk to his or her health, thereby triggering a duty to investigate. The appellants, however, contend that, given the limited information that was provided in the notices, a reasonable trier of fact might conclude they had no reason to suspect the contamination was capable of causing them personal injury.

We agree with appellants that the allegations set forth in the complaint and the *Cottle* declarations do not lead to a single, "reasonable conclusion" as to whether the

---

[9]     The appellants argue that, for the purposes of demurrer, it was improper for the court to infer that contamination was discussed at the 2007 community meeting. We need not address that contention because it has no bearing on the outcome of this appeal.

21

2007 notices should have caused them to suspect the contamination posed a risk to their health. (*Broberg, supra,* 171 Cal.App.4th at p. 922.) The May 1, 2007 letter merely references a forthcoming environmental remediation as one of several factors underlying the Housing Authority's decision to consider closing Ujima. It does not explain the nature of these unspecified "environmental concerns" or provide any additional facts about the issue. Other portions of the letter warned residents that they might lose their rights to federal relocation assistance if they moved from Ujima before receiving a formal notice of eligibility. Indeed, the letter states in bold, underlined print that residents should not move from the premises until receiving such a notice. A trier of fact might legitimately infer that a letter from a government entity telling residents to stay in their homes until further notice was not, standing alone, sufficient to raise a suspicion that unspecified "environmental concerns" posed a risk to their health or safety. (See *Call v. Kezirian* (1982) 135 Cal.App.3d 189, 199 ["The reasonableness of a delayed discovery may be a question of law [only if the] . . . allegations of the complaint . . . are susceptible to only one legitimate inference"].)

Similarly, more than one legitimate inference can be drawn from the fact that appellants' attended a community meeting in 2007 at which they were notified of the contamination. Respondents do not dispute that the speakers at these meetings, which included representatives from state housing authorities, told residents the contamination posed no risk to their health. We cannot say, as a matter of law, that individuals who received such information should have nonetheless suspected that the contaminants were capable of causing personal injuries.

Respondents, however, contend that two prior decisions support their contention that appellants had a duty to investigate their personal injury claims the moment they received information suggesting that Ujima might be contaminated. Both cases address the timeliness of toxic contamination claims alleging damage to real property. In the first case, *CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525 (*CAMSI*), the plaintiff filed claims alleging that Hunter, a former lessee, had contaminated a portion of plaintiff's property with toxic volatile organic chemicals (VOCs), and trichloroethene

22

(TCE). The complaint alleged that, several months after plaintiff acquired the property in 1984, a regional water board issued an order requiring the former owners to clean a non-toxic agent from the site and "'mandated investigation of the groundwater and soil of the Subject Property, partly because TCE . . . and other VOCs had been found thereon and thereunder.'" (*Id*. at pp. 1531-1532.) The order did not, however, indicate that the TCE or VOCs posed a health risk or require any entity to conduct a cleanup of those substances. In June of 1987, the water board issued a second notice informing plaintiff that subsequent testing had revealed that a cleanup of TCE and VOCs was also required at the site. In March of 1988, the water board issued a final order requiring TCE and VOCs cleanup that named Hunter as a primarily responsible party. Shortly thereafter, plaintiffs filed its complaint against Hunter.

Defendants demurred to the complaint, arguing that the pleaded facts demonstrated the action was barred under "the three-year [statute of] limitation period for claims for injury to real property." (*CAMSI, supra,* 230 Cal.App.3d at p. 1533.) Defendants contended that plaintiffs' claims had accrued in July of 1985, when the water board issued its initial notice announcing that further investigation was necessary due to the presence of TCE and VOCs. Plaintiff, however, argued that that its claims had accrued no earlier than June of 1987, when the water board issued its tentative order finding that the property was in fact contaminated with VOCs and TCE at levels that required environmental remediation. Alternatively, the plaintiff argued that it could amend its complaint to allege that the 1985 order had merely "'mentioned the presence of unspecified amounts of TCE and other VOCs . . . and [that the water board] had no evidence that the levels of TCE and other VOCs . . . threatened the property or the public health, or that these contaminants existed at levels which required the [board] to act.'" (*Id*. at p. 1539.)

The appellate court ruled that the action was barred under the discovery rule because the plaintiffs' allegations demonstrated, as a matter of law, that they had inquiry notice of their property claims no later than 1985: "Given [the water board's] notice of the presence of TCE or other VOCs . . . on the property, the owner could properly be

23

expected, in the exercise of reasonable diligence, to conduct an adequate investigation of . . . of its property. . . . [¶] . . . [A]s of July 1985 [plaintiff] possessed information sufficient at least to place it on notice of serious contamination problems on the parcel it owned, and from which, by exercise of reasonable diligence it could have learned the full extent of the problems and the nature of their source." (*CAMSI, supra,* 230 Cal.App.3d at pp. 1537-1538.) The court also ruled that, even if it were to accept plaintiff's proposed amendments to the complaint, the amended "allegations . . . would not . . . suffice to invoke the discovery rule. . . . [T]hat the [water] board so much as 'mentioned the presence of unspecified amounts' of VOCs precluded any possible assertion that [plaintiff] . . . would have been unable, by reasonable diligence, to have discovered the necessary facts at that time." (*Id*. at p. 1541.)

The second case respondents cite, *Mangini v. Aerojet-General Corp*. (1991) 230 Cal.App.3d 1125 (*Mangini*), involved similar facts. Plaintiffs filed a lawsuit alleging the defendant had contaminated their property with hazardous waste. The complaint asserted that, between 1960 and 1970, defendant had leased the property from the former owner pursuant to a recorded lease containing the following language: "'Lessors acknowledge that they are aware that certain activities of Lessee on the leased premises may be of a hazardous nature . . . .'" (*Id*. at p. 1140.) Four years after plaintiffs acquired the property in 1975, the Department of Justice informed them that it was investigating defendant's hazardous waste disposal practices in nearby areas. In April of 1984, plaintiffs received a letter from defendant asking permission to inspect their property. For the next two years, the defendant discussed with plaintiffs its plans to inspect and test the property, but refused to disclose why the testing was necessary or what activities it had conducted while leasing the property. In April 1987, an air pollution control district informed plaintiffs their property was contaminated with hazardous substances. In mid-1987, plaintiffs retained an attorney who obtained federal records "disclos[ing] for the first time to [plaintiffs] the nature of [defendant's] activities while it had leased the property," which included the "dispos[al] of . . . rocket fuel and other chemical contaminants . . . " (*Id*. at p. 1152.) Shortly thereafter, plaintiffs filed an action seeking compensation for

24

damages to their real property. Defendant demurred, arguing that plaintiffs' claims were barred by the applicable statute of limitations. The trial court sustained the demurrer.

The appellate court affirmed, explaining that the allegations in the complaint showed that, as of 1984, plaintiffs "knew the following facts: (1) the recorded lease gave notice that defendant had engaged in activities of a potentially hazardous nature on their land [citations]; (2) the Department of Justice investigated defendant's practices regarding disposal of hazardous waste in the area; and (3) defendant asked plaintiffs for permission to inspect their property." (*Mangini, supra,* 230 Cal.App.3d at p. 1152.) The court concluded that, considered together, this information was sufficient to cause plaintiffs to suspect defendant may have contaminated the property: "Whether any of these three facts in isolation would be sufficient to impart notice is open to dispute. However, the combination of these facts together establish as a matter of law that, when defendant contacted plaintiffs in 1984, plaintiffs had sufficient information to put them on notice of the possibility that defendant had dumped hazardous waste on their land." (*Id.* at pp. 1152-1153.)

Respondents contend that *CAMSI* and *Mangini* demonstrate that, as a matter of law, appellants' claims accrued when they first received notified of contamination at Ujima. Respondents, however, overlook a critical distinction between the nature of the claims at issue in those cases and the claims at issue here. In *CAMSI* and *Mangini*, the plaintiffs alleged damage to real property based on the presence of environmental contamination. The "injury" in both cases was the existence of the pollutants, which devalued their property. The courts, in turn, ruled that plaintiffs' claims necessarily accrued when they were provided information indicating that that their property might be contaminated with toxic materials.

In contrast, appellants in this case do not seek redress for damage to real property caused by the presence of contamination at Ujima; rather, they seek compensation for personal injuries that were allegedly caused by exposure to that contamination. Respondents have identified no portion of the complaint suggesting that, as of 2007, appellants possessed information that should have caused them to suspect that exposure

to the type of contamination present at Ujima was capable of causing them physical injury. Thus, while *CAMSI* and *Mangini* suggest appellants had reason to suspect the presence of contamination based on the notices they received in 2007, the cases provide no basis for concluding that, as a matter of law, the 2007 notices should have also caused them to suspect the contaminants posed a risk to their health.

Moreover, the nature of the information the plaintiffs possessed in *CAMSI* or *Mangini* is qualitatively different than the information appellants received here. In both of those cases, plaintiffs were told that their property might be contaminated with toxic substances, which was the very same injury for which they later sought redress. In this case, however, the 2007 notices did not inform appellants that exposure to the contamination might be harmful to their health; indeed, the notices contained additional information suggesting just the opposite. Had appellants been notified in 2007 that the contamination could potentially pose a risk to their health, or that authorities were still investigating that possibility, this case would present a closer question.

The only case respondents discuss in their briefs that addresses a toxic tort claim involving personal injuries is *Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518 (*Slovensky*).) However, the plaintiff in *Slovensky* specifically admitted that, several years before filing her claim, she was notified that the toxic substance (mold) was capable of causing the very sort of physical injuries she was suffering. Under the laws then in effect, plaintiff's toxic mold claims were subject to a one year statute of limitations. Plaintiff alleged she had no reason to suspect her physical injuries were caused by mold until March of 2000. She did not, however, dispute the following facts: (1) in 1997, she experienced an unresolved water intrusion into her apartment that left black and brown stains on her wall; (2) shortly thereafter, she developed a violent and persistent cough; (3) in 1998, she received multiple notices from the property manager "that apartments could have a mold problem related to water intrusion, that it could cause 'flu-like' effects, and that tenants should notify management immediately of 'any evidence of damage, of any kind, from a prior [water] event'" (*id*. at p. 1532); and (4) in response to the notices, plaintiff told the property manager she did not have a mold problem and "refused to

26

permit inspection, even as she experienced a battery of physical symptoms . . . . reasonably describable as 'flu-like'—along with the continuing water intrusion." (*Ibid*.) The appellate court concluded that, as a matter of law, the only reasonable inference that could be drawn from these uncontested facts was that plaintiff should have discovered the cause of her injury more than one year before March of 2000.

In their appellate brief, respondents assert that "*Slovensky* . . . found that plaintiff should have suspected the cause of injury . . . when she knew that water intrusion into her apartment left black and brown stains on the walls and that at the same time she developed a violent and persistent cough." Defendants omit, however, that the property manager also repeatedly notified plaintiff her apartment might be contaminated by a substance that was capable of producing the same physical symptoms she was experiencing. In this case, however, appellants' pleadings allege that the notices they received in 2007 suggested that exposure to the contamination at Ujima posed no risk to their health. Thus, to the extent *Slovensky* is relative to the current dispute, it serves only to highlight the absence of the type of undisputed facts that would be necessary to dismiss appellants' claims at this stage in the proceedings.

In sum, we conclude that the trial court erred in rejecting appellants' claim of delayed discovery based solely on the fact that they received notice of the contamination in 2007. During the discovery process, respondents may well uncover evidence demonstrating that, as of 2007, some or all of the appellants actually suspected the contamination was capable of causing them personal harm, or otherwise possessed additional information that put them on inquiry notice of such facts. At this early stage in the proceedings, however, it would be improper to presume that any reasonably prudent person who received the information provided in the May 2007 letter or at the April 2007 community meeting would, as a matter of law, suspect that the contamination posed a risk to human health.[10]

---

[10]    In a footnote, respondents argue that the claims of two appellants who received the May 1, 2007 letter–Diana Tate and Janice Tolliver–are alternatively time barred because

### B. *The Trial Court Erred in Dismissing the Johnson Appellants*

Unlike the other 55 appellants whose claims are discussed above, appellants Tiara Johnson, Tyweinisha Johnson and Wayne Johnson submitted *Cottle* declarations denying that they had ever received the May 1, 2007 letter or attended any community meeting regarding Ujima. Their declarations do state, however, that they were notified the contamination at Ujima might be harmful to their health at some point in 2008, but did not file their claims until the *Davis v. Exxon* action was initiated in April of 2011. Although the trial court did not explain why it dismissed the Johnsons' claims, the parties agree that, based on the hearing transcript, the court likely concluded the Johnsons' claims were barred because the date of discovery set forth in their *Cottle* declarations was more than two years prior to the date on which they filed their claims.

The Johnson appellants concede that the statements in their *Cottle* declarations preclude them from pursuing any personal injury claims predicated on exposure to environmental contamination that occurred while they lived at Ujima. They contend, however that "their claims . . . are not based on their residency at Ujima Village during the late 80s, but rather their residence in the adjacent residential community from 1995 to present." Each of their *Cottle* declarations state that: (1) they have lived in a residential community near Ujima from 1995 to present; (2) they have experienced various physical

their *Cottle* declarations admit they learned that the contamination was harmful to their health in late 2008, but did not join as plaintiffs in this case until April of 2011. Tate and Tolliver, however, contend that, unlike most of the appellants, the only claims they have pleaded are for continuing trespass, continuing nuisance and continuing public nuisance, which (they allege) are subject to a three year statute of limitations that accrued only after they moved from Ujima in 2009. We decline to consider respondents' alternative argument regarding these two appellants, which was raised in a footnote that contains no analysis or discussion explaining why Tate and Tolliver's continuing tort claims accrued when they were first notified of the contamination. (See *Evans v. CenterStone Development Co.* (2005) 134 Cal.App.4th 151, 160 ["We do not have to consider issues discussed only in a footnote"]; *Roberts v. Lomanto* (2003) 112 Cal.App.4th 1553, 1562 [assertions raised only in a footnote may be properly "disregarded"]; Cal. Rules of Court, rule 8.204, subd. (a)(1)(B).)

ailments while living "near Ujima"; and (3) they did not learn that contamination from Ujima had migrated to their current residential community until April of 2011.

Although the fourth amended complaint indicates the Johnsons may have initially sought recovery for injuries caused by exposure to contamination both at Ujima and their current residence, their appellate brief makes clear that they have since abandoned any claim related to contamination at Ujima.[11] Thus, the only issue we must decide is whether the face of the complaint demonstrates their claims for personal injuries from contamination at their current residential neighborhood are time barred.

Generally, a demurrer may only be sustained on statute of limitations grounds if the "complaint disclos[es] on its face that the limitations period has expired." (*Fuller, supra,* 216 Cal.App.4th at p. 962.) Although the allegations in the complaint demonstrate the contamination at Ujima occurred many decades before this action was filed, there are no allegations indicating when the contamination migrated to the adjacent residential neighborhood. The complaint states only that the surrounding neighborhoods were first tested for environmental contamination in March of 2011, at which point it was discovered that the contamination had in fact migrated from Ujima. The Johnsons' *Cottle* declarations similarly allege that they first learned the contamination had migrated from Ujima to their current community in April of 2011. Thus, based on the operative pleadings, it is impossible to determine when the Johnsons' causes of action for off-site exposure accrued because it is not clear when the contamination initially migrated from

---

**11** To the extent the allegations in the fourth amended complaint suggest that the Johnson appellants' claims were based solely on exposure to contamination at Ujima, rather than on exposure at their current residence, we treat their statements in their appellant briefs as proposed amendments to the fourth amended complaint. (*Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1072 [plaintiff is permitted to "'"show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading" . . . "for the first time to the reviewing court." [Citation.]'"].)

Ujima to their current neighborhood. Accordingly, it was improper to dismiss their claims on statute of limitations grounds at this stage in the proceedings.[12]

Respondents, however, argue that the Johnsons' claims are untimely because any injuries they may have developed while living in their current neighborhood were originally caused by the contamination at Ujima. In support, respondents note that each of the Johnsons' *Cottle* declarations admit that they suffered physical ailments while living both "at" and "near Ujima." At this stage, it would be improper to speculate whether the Johnson appellants will be able to prove the injuries for which they seek redress were caused or contributed to by exposure to contamination at their current residence, rather than by exposure that occurred while living at Ujima. Because appellants allege they suffered injury from exposure to contamination that migrated from Ujima to their current neighborhood, and because the complaint does not indicate when that migration occurred, the trial court erred in dismissing the claims on timeliness grounds at the demurrer stage.

### C. *The Trial Court Erred in Dismissing Appellants' Property Claims against Government Entities*

A subset of fifteen appellants identified in "Exhibit 3" to their brief argue that the trial court erred in dismissing their claims against the County defendants for injury to real property. Under Government Code sections 911, *et seq.*, a plaintiff must present a government claim letter before suing a public entity. Government Code section 911.2

---

**12** At a subsequent demurrer hearing involving the fifth amended complaint, the trial court reached a similar conclusion regarding a different plaintiff whose injuries were allegedly caused by exposure to contamination in an adjacent neighborhood. Respondents argued that the plaintiff's claims had accrued when he first learned that the contamination at Ujima was harmful to human health, which had occurred outside the applicable limitations period. The court rejected the argument, explaining that knowledge of contamination at an Ujima was not, as a matter of law, sufficient to trigger the statute of limitations for claims predicated on exposure to contamination at an "adjacent site." In regards to the Johnson appellants, it is unclear from the record whether the trial court was ever informed that a portion of their claims were predicated on exposure to contamination at a site adjacent to Ujima, rather than at Ujima itself.

states that the claim letter must be submitted not later than six months after accrual for causes of action "relating to . . . injury to person or to personal property," and not later than twelve months after accrual for claims "relating to any other cause of action."

43 of the 58 appellants have raised no argument as to the trial court's dismissal of their claims against the County defendants. Those 43 appellants have therefore abandoned those claims. With the exception of the three Johnson appellants, the remaining 15 appellants have abandoned their personal injury claims against the County defendants, apparently conceding that they failed to file their claims letters within six months after those claims accrued. They argue, however, that they did file their claim letters within one year of accrual, thereby preserving their claims for injuries to real property. The County defendants do not address this argument in their briefing. Instead, they argue only that "none of these . . . appellants presented a claim within 6 months of the accrual date of their claims as required by the Government Claims Act." We therefore presume that County defendants do not dispute that each of these 15 appellants filed their claims letters within twelve months of accrual of their property claims, and may therefore continue to pursue such claims.

Finally, the three Johnson appellants contend that they filed their government claim letters within six months of discovering that contamination had migrated to their residential neighborhood in April of 2011, thereby preserving their right to pursue claims against the County defendants for injury to both their person and their real property. As explained above, the pleadings allege that plaintiffs initially discovered that contamination had migrated from Ujima to the adjacent residential neighborhood in 2011; there are no other allegations indicating when this migration may have initially occurred. The Johnsons' *Cottle* declarations also assert they filed their government claims letters within six months of the date they discovered contamination at their current neighborhood. Accordingly, for the reasons set forth above regarding the Johnsons' claims against the private defendants, they may proceed with all of their claims against the County defendants that are predicated on exposure to contamination at their current residence.

In sum, based on the briefing and the record before us, we conclude that: (1) 43 of the 58 appellants have abandoned all of their claims against the County defendants; (2) the Johnson appellants have preserved their right to pursue all of their claims against the County defendants for injuries arising from exposure to contamination at their current site of residence; and (3) the remaining 13 appellants identified in exhibit three to the appellants' opening appellate brief may only pursue claims against the County defendants for damage to real property.

## DISPOSITION

The trial court's order sustaining the demurrer to appellants' personal injuries claims against the non-government defendants is reversed. The trial court's order is also reversed with respect to: (1) all claims asserted by the Johnson appellants regarding exposure to contamination at their current residential neighborhood; and (2) claims for damage to real property asserted against the County defendants by the other 12 appellants identified in Exhibit Three to appellants' opening claims. The order is affirmed as to any other claims alleged by any of the other appellants. Appellants shall recover their costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

SEGAL, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

32